## HOWARD SPORTS DAILY, INC. *v.* PUBLIC SERVICE COMMISSION

[No. 18, January Term, 1941.]

*Decided February 19th, 1941.*

The cause was argued before SLOAN, MITCHELL, JOHNSON, DELAPLAINE and COLLINS, JJ.

*Samuel Carliner,* with whom was *S. Raymond Dunn* on the brief, for the appellant.

*J. Purdon Wright,* for the Public Service Commission, appellee.

*Joseph T. Brennan,* with whom were *Hilary W. Gans* and *Brown & Brune* on the brief, for the Western Union Telegraph Co., appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Howard Sports Daily, Inc., is appealing from a decree of the Circuit Court No. 2 of Baltimore City, which affirmed an order of the Public Service Commission refusing to require the Western Union Telegraph Company to furnish special contract service for the appellant.

In January, 1940, the Western Union agreed to furnish telegraphic service for the appellant's business of gathering and distributing sports news. The facilities included a Morse circuit extending from New Jersey to its office in Elkridge, and a teleprinter to transmit the news to tickers in Maryland, Virginia, North Carolina, South Carolina and Georgia. The service was rendered in ac-

cordance with a tariff filed with the Federal Communications Commission, stipulating that special contract service shall be furnished for an initial period of one month and may be cancelled thereafter upon a minimum of one day's notice by either party, and also that no facilities shall be used for any purpose or in any manner, directly or indirectly, in violation of any Federal law or the laws of any of the States through which the circuits pass or the equipment is located.

In February the telegraph company, after receiving a warning from the United States Attorney for the Northern District of Illinois that the facilities were used in violation of federal and state statutes, terminated the interstate service; but the appellant filed a complaint with the Public Service Commission of Maryland under Code, art. 23, sec. 380, to prevent discontinuance of service within the State. The Commission passed a temporary restraining order, after which the appellant acquired its news from outside the State by telephone, but continued to transmit the news by teleprinter to customers in Maryland. The reports sent by the appellant included the entries in races, the positions of the horses at various stages of the races, the final results, and the prizes paid to the winning horses. According to witnesses who testified before the Commission on March 19th, there were eleven tickers in operation in the State. In Hyattsville there were two tickers, one of which was installed in a second-floor apartment, the other in a cellar. The other nine were located in Frederick, Emmitsburg, Brunswick, Bel Air, Havre de Grace, Bladensburg, Mt. Rainier, Silver Hill, and Takoma Park. On five of the premises gambling was seen by the witnesses. It is beyond question that the contract was subject to cancellation. On April 3rd the Commission passed an order dismissing the complaint. On the same day the appellant filed a bill of complaint under Code, art. 23, sec. 415, and the court enjoined the Western Union from disconnecting the telegraphic service pending determination of the case, and ordered the Public

Service Commission to show cause why its order should not be vacated and annulled. After the trial the court dismissed the appellant's bill.

The appellant complained that the order of the Commission deprived it of due process of law and denied it the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States, and Article 23 of the Maryland Declaration of Rights, which provides that no man ought to be deprived of his life, liberty or property, but by the judgment of his peers, or by the law of the land. Unquestionably, if a law is applied and administered by public authority "with an evil eye and an unequal hand" so as to make unjust discrimination between persons in similar circumstances, material to their rights, such denial of equal justice is within the prohibition of the Constitution. *Yick Wo v. Hopkins,* 118 U. S. 356, 373, 6 S. Ct. 1064, 1073, 30 L. Ed. 220, 227. But in considering the application of the constitutional safeguard, due regard must be given to the principle that the State may regulate and restrict the freedom of the individual to act whenever such regulation or restraint is essential to the protection of the public safety, health or morals. *Dasch v. Jackson,* 170 Md. 251, 262, 183 A. 534, 539. Chief Justice Taft thus defined "due process" as guaranteed by the Fourteenth Amendment: "The due process clause requires that every man shall have the protection of his day in court, and the benefit of the general law, a law which hears before it condemns which proceeds not arbitrarly or capriciously, but upon inquiry, and renders judgment only after trial, so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society." *Truax v. Corrigan,* 257 U. S. 312, 332, 42 S. Ct. 124, 129, 66 L. Ed. 254, 263.

The court cannot adopt the view of the appellant that the Public Service Commission acted arbitrarily or capriciously. To force a public utility, under the guise of impartial regulation, to furnish service and facilities for unlawful purposes would be contrary to public policy.

We cannot believe that the Legislature, in providing that no telegraph or telephone company shall subject any person or corporation to "unfair prejudice or disadvantage," Code, art. 23, sec. 411, intended to make such service mandatory where it would facilitate the violation of the law. Whether a complainant has been deprived of due process of law and denied the equal protection of the laws by action of an administrative body depends upon whether it acted contrary to the statutes and rules and with arbitrary discrimination. *Thompson v. Spear*, 91 Fed. 2nd 430, 433. The Fourteenth Amendment protects the citizens in their right to engage in any lawful business, but it does not prevent legislation prohibiting any business which is inherently vicious and harmful. *Adams v. Tanner*, 244 U. S. 590, 596, 37 S. Ct. 662, 665, 61 L. Ed. 1336, 1343. The State has the undoubted right to enact legislation in the legitimate exercise of its police power. The sovereignty of the State would be a mockery if it lacked the power to compel its citizens to respect its laws. *Allgeyer v. State of Louisiana*, 165 U. S. 578, 17 S. Ct. 427, 41 L. Ed. 832. For example, when a complainant sought to enjoin the Maryland Public Service Commission and the Commissioner of Motor Vehicles from prohibiting him from carrying passengers for hire in this state, our court held that, since his scheme contemplated an evasion of the law, he was entitled to no consideration in a court of equity. When the cry of "property rights" is raised in an effort to circumvent the provisions of a law designed to promote and protect the public interest, equity will not aid the attempt by affording the extraordinary remedy of injunction. *Restivo v. Public Service Commission*, 149 Md. 30, 37, 129 A. 884, 886.

It was insisted that the transmission of sports news does not violate any law of the State merely because a recipient of it puts it to illegal use, and that consequently no evidence of illegal activities on the premises of customers should have been produced against the appellant. Harry E. Bilson, secretary and treasurer of the appellant, asserted that while he had executed the con-

tracts with the customers, he had never visited their places of business, and professed ignorance of the character of their operations. But it is well settled that a telegraph company has the right to refuse service which is connected with illegal operations. The company may refuse to render such service, not only where such action would subject it to prosecution as a participant in the illegality, but also where it would have the effect of promoting illegality, even though the company might not be liable to punishment for rendering the service. There is abundant authority for the principle that a telegraph company cannot be compelled to furnish reports of market prices to a bucket shop, notwithstanding its duty as a public service corporation to serve all customers without discrimination, and even though it may have executed a contract to furnish such reports. Otherwise, telegraph companies would be converted into public vehicles for the consummation of all kinds of illegal designs. *Smith v. Western Union Telegraph Co.*, 84 Ky. 664, 2 S. W. 483, 485, 8 Ky. Law Rep. 672; *Western Union Telegraph Co. v. State*, 165 Ind. 492, 76 N. E. 100, 108; *Bryant v. Western Union Telegraph Co.* 17 Fed. 825; 1 *Wyman, Public Service Corporations*, secs. 590, 607, 613. Accordingly, after the Kentucky Legislature passed an act making it a criminal offense to withhold the transmission or delivery of a telegraph or telephone message, the Court of Appeals of Kentucky observed: "It would be neither courteous nor fair to the legislative branch of the state government to impute to it, in construing one of its statutes, a purpose to encourage crime and foster immorality * * *. To hold that the statute being considered compelled the transmission of messages by the telegraph company, known to be designed for purposes of gambling within the commonwealth, would be to convict the legislature of favoring the vice of gambling. On the contrary, the true rule of interpretation is that the purpose of the legislature in passing such act will be presumed to be in harmony with the general public policy, evidenced by innumerable statutes against gambling in almost every

conceivable form." *City of Louisville v. Wehmhoff*, 116 Ky. 812, 76 S. W. 876, 884, 79 S. W. 201.

The second contention of the appellant was that. since it had been publishing a daily sports sheet, the order of the Public Service Commission abridged the constitutional privilege of freedom of the press. Freedom of speech and of the press are rights guaranteed by our fundamental law. The First Amendment guarantees the right against abridgment by Congress; the due process clause of the Fourteenth Amendment guarantees it against abridgment by any State. Article 40 of the Maryland Declaration of Rights declares that the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege. For many years after the invention of the printing press, the subjects in England were forbidden to publish any printed matter without the license of the government. It was to prevent any such interference that the American patriots incorporated these provisions in the Federal and State Constitutions. *Negley v. Farrow*, 60 Md. 158, 176. The liberty of the press is a right belonging to every one, whether the proprietor of a newspaper or not, to publish whatever he pleases without the interference of the government. Neither the Federal Government nor the State can adopt any form of previous restraint upon printed publications or their circulation, or take any action which might prevent such free and general discussion of public matters as seems essential to prepare the people for an intelligent exercise of their rights as citizens. *Grosjean v. American Press Co.*, 297 U. S. 233, 249, 56 S. Ct. 444, 449, 80 L. Ed. 660, 668.

In 1931 the Supreme Court of the United States held invalid an act of the Minnesota Legislature, *Mason's Minn. St. 1927*, sec. 10123-1, which sought to permit the issuance of an injunction against any business engaged in publishing "a malicious, scandalous and defamatory newspaper, magazine or other periodical." The Court

held that the statute imposed an unconstitutional restraint upon those who publish charges against public officials. Chief Justice Hughes declared in the opinion of the Court: "The conception of the liberty of the press in this country had broadened with the exigencies of the colonial period and with the efforts to secure freedom from oppressive administration. That liberty was especially cherished for the immunity it afforded from previous restraint of the publication of censure of public officers and charges of official misconduct. * * * The statute in question cannot be justified by reason of the fact that the publisher is permitted to show, before injunction issues, that the matter published is true and is published with good motives and for justifiable ends. If such a statute, authorizing suppression and injunction on such a basis, is constitutionally valid, it would be equally permissible for the Legislature to provide that at any time the publisher of any newspaper could be * * * required to produce proof of the truth of his publication, or of what he intended to publish and of his motives, or stand enjoined. If this can be done, the Legislature may provide machinery for determining in the complete exercise of its discretion what are justifiable ends and restrain publication accordingly. And it would be but a step to a complete system of censorship." *Near v. State of Minnesota,* 283 U. S. 697, 716, 721, 51 S. Ct. 625, 631, 633, 75 L. Ed. 1357, 1368, 1370.

But the Minnesota act was an attempt on the part of the State to suppress publication; in the case at bar the appellant is attempting to compel another company to participate in its operations. It is obvious that the appellant has not been denied the privilege of expressing its opinion on any subject. It is an ancient doctrine of the common law that no court should lend its aid to enforce a contract to do an act that is illegal, or which is inconsistent with sound morals or public policy, or which tends to corrupt or contaminate by improper influences the integrity of our social or political institutions. *Marshall v. Baltimore & Ohio R. R. Co.,* 16 How. 314, 344,

14 L. Ed. 953, 962. The State, in the exercise of the police power and in the interest of the public welfare, has the undoubted right to regulate and limit the right of contract. *Wight v. Baltimore & Ohio R. R. Co.,* 146 Md. 66, 75, 125 A. 881; *Adair v. United States,* 208 U. S. 161, 172, 28 S. Ct. 277, 280, 52 L. Ed. 436, 441.

The appellant's third contention was that the court erred in striking out the evidence presented at the trial below and in refusing to send it to the Commission. The appellant offered to show that the Western Union has been furnishing special contract service of a similar type for other concerns. However, the evidence clearly showed that the appellant's business was to furnish news of such a nature and in such a manner that the recipients would be expected to use it for an illegal purpose. The appellant also offered to produce a witness to testify that when he visited the premises where the tickers were located subsequent to the hearing before the Commission, he saw no violation of the law. The statute provides that if at the trail the plaintiff shall introduce evidence which the court finds to be different from or additional to that offered before the Commission, the court shall transmit a copy of the evidence to the Commission and stay the proceedings for 15 days from the date of the transmission. The Commission may thereupon modify or rescind its order, and shall report its action to the court within 10 days from the receipt of the evidence. The judgment of the court is then rendered upon the amended order. Code, art. 23, sec. 416.

In exceptional cases, where unusual changes occur subsequent to the hearing before the Commission beyond the control of the parties, the trial court is justified in transmitting to the Commission any evidence relating to the changed conditions. It has been decided by the Supreme Court of Indiana that, since the statute does not provide that the "different" or "additional" evidence shall relate only to matters existing prior to the decision of the Commission, evidence relating to matters occurring at any time up to the trial on appeal is unobjectionable. *Public*

*Service Commission v. Frazee,* 188 Ind., 573, 122 N. E. 328. Thus, when an order of the Nebraska State Railway Commission was challenged as unreasonable on account of changed conditions due to war, the Supreme Court of Nebraska asserted: "The order was made before the United States engaged in the present war. As a military measure the federal government is now controlling defendant's railway system. The enforcement of the order challenged on appeal will require labor, materials, and money. Owing to the exigencies of war, the government is making extraordinary demands for funds, men, materials, and railroad equipment. * * * When the order was made there was no occasion or opportunity to present or consider these features of the questions presented by the appeal. * * * The Nebraska' State Railway Commission should have an opportunity for further inquiry in view of changed conditions." *Ralston Business Men's Ass'n v. Bush,* 102 Neb. 446, 167 N. W. 727.

However, on any appeal from an order of the Commission, the burden of proof is on the complainant to show that the order is unlawful or unreasonable "by clear and satisfactory evidence." Code, art. 23, sec. 419. Manifestly, if the court finds that the evidence is not clear and satisfactory, it would be a perfunctory and frivolous proceeding to transmit the evidence to the Commission simply to have the Commission transmit it back again. Such a procedure would serve no useful purpose whenever the court determines in the first instance that the "different" or "additional" evidence does not alter the conclusion. To justify the court in remanding the case to the Commission, the evidence should be so substantial and sufficient that it might have the effect of making some change in the conclusion. The appeal to the court of chancery should not be used as a door through which the appellant can readily escape from his situation and thereby circumvent the work of the Commission. The adjudications of the Commission are *prima facie* correct, and the courts ascribe to them the strength due to judgments of a tribunal established by law and informed by

experience. The court should not examine the facts in any case further than to determine whether there was substantial evidence to sustain the order. The findings of the Commission are subject to review, but when supported by evidence they are accepted as final. The court will not disturb a decision of the Commission unless it exceeded its jurisdiction or arbitrarily disregarded the rights of the parties. *Public Service Commission v. Northern Central Ry. Co.,* 122 Md. 355, 391, 90 A. 105, 118; *Public Service Commission v. Byron,* 153 Md. 464, 474, 138 A. 404, 410; *Public Service Commission v. Williams,* 167 Md. 316, 331, 173 A. 259, 265; *West v. Tidewater Express Lines,* 168 Md. 581, 586, 179 A. 176, 179; 3 *Pond, Public Utilities,* secs. 938, 949, 940.

As the Public Service Commission did not exceed its statutory power or act unreasonably in this case, and no reversible error was committed by the court in striking out the evidence offered at the trial, we affirm the decree dismissing the bill of complaint.

*Decree affirmed, with costs.*