## BRUCE ET AL. *v.* DIRECTOR, DEPARTMENT OF CHESAPEAKE BAY AFFAIRS ET AL.

[No. 351, September Term, 1970.]

*Per Curiam Order March 9, 1971.*

*Opinion Filed April 16, 1971.*

586

*Motion for rehearing and to recall mandate filed March 17, 1971; denied March 17, 1971.*

The cause was argued before BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Bayard Z. Hochberg,* with whom were *Sigmund Levin, Levin & Hochberg* and *Lionel Bennett* on the brief, for appellants.

*Edward S. Digges, Special Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellees.

FINAN, J., delivered the opinion of the Court.

On March 9, 1970, this Court issued a *per curiam* order reversing that portion of the decree of the chancellor in the lower court dated August 26, 1970, wherein he declared §§ 322 and 700 (a), (c) and (i), of Article 66C of the Maryland Code (1970 Repl. Vol.) to be constitutional and dismissed the appellants' bill of complaint. At that time we stated we would file an opinion setting forth the reasons for this reversal, which we now do. The question before this Court is the constitutionality of the residential requirements and territorial restrictions placed by the State on the licensing of commercial fishermen who engage in crabbing and oystering in the tidal waters of Maryland.

The appellants are residents of Somerset County and are members of the Tangier Sound Watermen's Association. They are a part of that hardy breed of men who earn their livelihood by seasonally combing the oyster bars of the Chesapeake Bay and its estuaries and following the migration of the elusive crab. They were the complainants below in a bill in equity filed in Somerset County seeking a declaration [1] that Sections 322 and 700 of Article 66C restricting the taking and catching of crabs and oysters in Maryland are illegal, unconstitutional, and void because they violate the Fourteenth Amendment of the Constitution of the United States and of Article 23 of the Declaration of Rights of the Constitution of Maryland.

Defendants in the bill, appellees in this Court, are the Director of the Department of Chesapeake Bay Affairs and the Chairman and members of the Commission of Chesapeake Bay Affairs (Commission). They are charged with the powers and duties of enforcement of the challenged statutes and of licensing persons to take and catch crabs and oysters in Maryland. The bill sought injunc-

---

1. It is immaterial whether the proceedings below be considered as coming under general equity relief or under the Declaratory Judgment Act, Maryland Code (1971 Repl. Vol.) Art. 31A. In Reddick v. State, 213 Md. 18, 31, 130 A. 2d 762 (1957) we stated, "it is not necessary that a declaratory judgment be in any particular form, as long as the court by its decree, actually passes upon or adjudges the issues raised by the proceedings."

tive relief against appellees because of the invalidity of the statutes in question.

The only testimony was that introduced by the watermen through the persons of Oscar J. Smith, President of the Tangier Sound Watermen's Association, a resident of Smith Island and a life-long waterman and licensed commercial crabber and oysterman, and that of Carlton Y. Dize, a member of the Maryland House of Delegates from Somerset County. The appellants in their brief presented the following statement of facts which was accepted by the Commission and which we set forth together with the statutes involved.

### Crabbing

"§ 322. Crabbers' Licenses

Any resident of Maryland desiring to take or catch crabs from the waters thereof for market, and each person working on any boat used in taking or catching of crabs for market, shall first obtain a numbered license through the clerk of the circuit court for the county in which he resides or from the clerk of the Court of Common Pleas, if he resides in Baltimore City, and shall pay the sum of $2, and in addition thereto twenty-five cents to the clerk of the court for issuing same, which license shall be good for the year of issuance only and shall entitle the person obtaining same to take or catch crabs by any of the methods now or hereafter authorized to be used, including scrape, nets, dip nets or trotline. Provided, that such license shall not authorize the taking or catching of crabs in any creek, cove, river, inlet, bay or sound within the limits of any county other than that wherein the license shall have been granted; provided that nothing in this section shall be so construed as to prevent the citizens of counties divided by a river from using such dividing river in common. All persons taking or catching crabs under

the provisions of this subheading shall exhibit their license for so doing when required by any officer of the Maryland marine police force, or other officers of the State." Maryland Code (1970 Repl. Vol.) Art. 66C.

Crabs are found in marketable quantities in only 13 of the State's 23 counties, namely Worcester, Somerset, Wicomico, Dorchester, Talbot, Queen Anne's, Kent, Baltimore, Anne Arundel, Calvert, St. Mary's, Charles and Prince George's.

The migration and movements of crabs and their erratic growth may cause them to be scarce or not to appear at all, or to be too small to harvest until late in the season. Crabs migrate from south to north up the Chesapeake Bay as the weather grows warmer, and this migration takes place annually.

Crabs can move very rapidly when migrating, and be plentiful one day in one place and move from that place overnight. They can be plentiful in the waters of one county and wholly absent from the waters of an adjoining county. This occurred in 1964 when Somerset County had no crabs and Dorchester County had an abundance of them. There can also be, as in 1969, practically no crabs on the eastern side of the Bay and a plentitude of them on the west side and the Potomac River.

There are 530 licensed crabbers in Somerset County and approximately 600 in Dorchester County. These are the professional watermen who work with scrapes, nets and trotlines and do not include pot crabbers who must obtain a license from Annapolis to take crabs and not from the Clerk of the County wherein he resides, as in the case of crabbing other than by pots.

A resident of Dorchester can crab by pot anywhere in Somerset but the latter cannot crab by pot in Dorchester. This is because the Department of Chesapeake Bay Affairs has provided by regulation that areas set aside for oyster dredging are the areas where crab pots may be set in Tangier Sound. These are areas that are thus set aside

for dredging, and crabs may be caught by pot in those areas by anyone, not only residents of Somerset. Dorchester has no area set aside for dredging, except for one area in the Choptank River, but nobody is allowed to crab by pot in that area. Dorchester pot crabbers may, however, come into Somerset.

Anywhere from one-half to two-thirds of the entire crab catch in Somerset waters is taken by crab pots by crabbers from other counties. There are more pot crabbers in Somerset than there are netters and scrapers.

Very little crabbing is done in the Chesapeake Bay waters, which are not waters of any county, except by crab pots. This is because of the depth of the water. Crabbers using pots start earlier in the season and go down to the Virginia line to catch the crabs that first come along. There is not any place that a resident of another county cannot crab with pots. There is no discrimination as to crab pots. The law prohibits residents of other counties from taking crabs and oysters in Somerset and the Department has been requested by the appellants to enforce these laws.

The effect of § 322 on a crabber's living, other than the crab potter, of prohibiting him from crabbing in another county is to reduce his income to the point where his family has a bare subsistence.

A Somerset County waterman could hire a man who resides in any other county in the State to assist him in crabbing or oystering commercially but under § 322 and § 700, such a helper could not obtain a license and therefore would not legally be eligible to work. On the other hand the same waterman could hire a Minister of the Gospel from any county and, as he is expressly exempted from the operation of § 700, he could tong oysters.

The chancellor refused to allow testimony as to the lack of any relationship between the subject of the conservation of crab resources and the restrictions in § 322, and appellants proffered through Oscar J. Smith, that there is absolutely no relationship between the subject of crab conservation and the restrictions of § 322 that

prohibit a crabber from crabbing in the waters of a county other than his county of residence.

*Oystering*

"§ 700 Tonging.

(a) *Tonging license required.* Any person over the age of fourteen who shall engage in the taking or catching of oysters by tongs or patent tongs from any natural oyster bar of this State, or who shall be employed on any tong boat shall first obtain a license as prescribed herein.

\* \* \*

(c) *How to apply for license.* Every applicant for a tonging license shall be required to appear before the clerk of the circuit court of the county or a notary public in and for said county wherein he is applying, and make oath or affirmation that the facts which he shall set forth are strictly true; that he has been a bona fide resident of the county for twelve months next preceding his application for said license; that he desires and intends to use said license in the county in which he resides or in the waters used in common by his own and other counties; and that he will comply with and obey all laws of this State regulating the taking or catching of oysters with tongs or patent tongs; provided, however, that any duly ordained minister of the gospel shall not be subject to the residence requirements of this section.

\* \* \*

(i) *Privileges of tonging license; locations,* [This section restricts the licensee to the waters of the county in which the license was issued, except where certain rivers are common to more than one county.]" Maryland Code (1970 Repl. Vol.) Art. 66C.

Oysters are found in the same 13 tidewater counties as are crabs. Oyster bars are specifically marked on a map and they are not migratory and do not move. Once formed, they remain permanently in one area. However, oyster bars have in the past gone out of existence and new ones have developed, and with storms things change considerably. The oysters themselves are not migratory.[2] The current, temperature and salinity of the water are factors which have a dramatic effect on their growth.[3]

The State of Maryland has a propagation program and spends between a million and a million and a half dollars a year for planting oysters, both seed and shells, all over the State including the Bay and the county waters. The chancellor refused to allow testimony as to the action the State is taking in this respect, and appellants proffered through Carlton Y. Dize, that large sums of money are being spent on other counties to the benefit of persons in other counties and that watermen in Somerset are being deprived of benefits bestowed by the State on other counties.

The chancellor refused to allow testimony as to the kind of oyster beds that lie in the waters of Anne Arundel County, and the watermen proffered through Oscar J. Smith, that oysters in the waters of Anne Arundel County are so plentiful that there are more than the watermen

---

2. "Secret and self-contained, and solitary as an oyster," Dickens: *A Christmas Carol*.

3. "The American Eastern oyster has a sedentary sex life. In adult form both male and female oysters are unable to move. They are physically attached to the bottom or bed (rock, shell or other cultch). But between May and October, female oysters release eggs and male oysters release sperm. Spawning occurs upon the chance encounter of egg and sperm in the water over the bed. The resulting larva, after six or seven days, acquires a shell (thereby becoming known as a spat) and settles back to the bed where it attaches itself to the cultch. This process is referred to as spatfall. The set or number of spat which attach themselves to the cultch in a given area depends on the availability of a clean, firm surface and varies according to current, temperatures and salinities.

Maryland's Chesapeake Bay waters afford an almost perfect environment for these biological processes." Garrett Power, "More About Oysters Than You Wanted to Know," 30 Md. L. Rev. 199 (1970).

of Anne Arundel County can use, but oystermen from other counties cannot enter that area.

For the past 10 or 12 years Somerset has had poor oyster seasons for tonging and patent tonging, because of MSX or some other disease, and the oyster yield has been poor. Oysters will not live in Somerset although they keep planting them. Somerset countians have had to leave the county to make a living in winter. They just do not have oysters in Somerset and have to obtain most of their catch in the waters of the Bay.

As to the effect on the ability of the oystermen to make a living, the prohibition of § 700 that prevents oystermen from going to the waters of another county is the same as that on the crabber under § 322. He needs to go across county lines to make a living on occasions such as are currently present in Somerset.

The trial judge likewise refused to allow Mr. Smith to testify as to the lack of any relationship between the conservation of oyster resources and the restrictions in § 700 that prevent oystermen from oystering in the waters of another county, and appellants likewise proffered through Mr. Smith that there is no reasonable relationship between the prohibition from going across the county line and the general subject of natural resources, including the oyster.

Upon the conclusion of the taking of testimony (the Commission offering none in rebuttal) Chief Judge E. McMaster Duer filed a memorandum opinion holding the statutes constitutional and dismissed the bill. This appeal is from that decree.

### Standing of Appellants

*In limine* there is the question of the standing of the appellants to maintain this action which must be disposed of before we consider the merits of the case. We think the challenge to their standing is without merit and that this issue is controlled by *Davis v. State,* 183 Md. 385, 37 A. 2d 880 (1944). In *Davis,* the Court was presented

with a proceeding brought by a medical doctor under the Declaratory Judgment Act, requesting a declaration as to the validity of Ch. 600 of the Acts of 1943, which regulated advertising by physicians and surgeons. The doctor claimed that the restrictions on advertising imposed by the Act adversely affected his practice and had materially reduced his income. Although he was unsuccessful in his attack on the constitutionality of the Act, nonetheless, the Court recognized his standing as a complainant, stating:

> "* * * if a person is directly affected by a statute, there is no reason why he should not be permitted to obtain a judicial declaration that the statute is unconstitutional. It is true that a court of equity has power to restrain the enforcement of a void statute or ordinance at the suit of a person injuriously affected. [citing cases.] But in this case complainant is affected by the Act of 1943 and he is entitled to apply for a declaratory judgment under the Uniform Act, rather than run the risk of being subjected to criminal prosecution. * * *." 183 Md. 389.

In the case at bar the uncontradicted evidence shows that the establishment of the territorial restrictions by the statutes have had a severe adverse economic effect on the appellants, as well as on all commercial crabbers and oystermen of Somerset County. We have no difficulty in concluding that their interests are peculiarly affected in that they have sustained a special damage, and consequently have the requisite standing to sue. *Richmark Realty v. Whittlif,* 226 Md. 273, 282, 173 A. 2d 196 (1961). Cf. *Pitts v. State Board of Examiners,* 222 Md. 224, 226, 160 A. 2d 200 (1960) ; *Dvorine v. Castelberg Corp.,* 170 Md. 661, 668, 185 A. 562 (1936).

### *Question of Constitutionality of the Statutes*

The learned chancellor below, in upholding the constitutionality of the statutes, stated:

> "It is my belief that the Legislature in order to preserve the public rights for crabbers and oystermen in the State of Maryland may place certain restrictions on the right of the public to use its waters and this Court cannot question the basis and reasonableness of the restrictions imposed by the Legislature but can only pass on the constitutionality."

In answer to this, we would observe that this Court has repeatedly held, with regard to any legislation which imposes regulation upon the exercise of a constitutional right, that the question of whether the legislation enacted is a reasonable exercise of the police power and in the interest of the safety, health, moral, social or economic welfare of the body politic, or conversely whether it is unwarranted, unfair, burdensome, discriminatory and arbitrary, has always been very much the business of the courts. This is never to be confused with the proposition that if the legislation is constitutional, the wisdom of it is beyond the purview of the courts. A proper perspective of the interplay existing between the Legislature and the Courts in this sensitive area where the exercise of the police power by the Legislature is being orchestrated is found in Judge Hammond's (now Chief Judge) opinion in *Allied American Mutual Fire Insurance Co. v. Commissioner of Motor Vehicles,* 219 Md. 607, 623, 624, 150 A. 2d 421 (1959) ; see also *Daniel Loughran Co. v. Lord Baltimore Candy and Tobacco Co.,* 178 Md. 38, 48, 12 A. 2d 201 (1940).

The chancellor in sustaining the constitutionality of the statutes relied entirely on *Cox v. Revelle,* 125 Md. 579, 94 A. 203 (1915) and Judge Urner's dictum on pages 586-587, wherein writing for the Court he said:

> "It was urged that the Act does not state for what public use the natural bars under lease are to be condemned, and that the Court is consequently not in a position to decide whether the intended use is in fact of a public nature. The

further point is made that if the lots so acquired by the State are designed to be used for the purposes of a public oyster fishery under existing law, regard must then be had to the statutory provision that the right to take oysters for sale from grounds within the limits of any county shall be confined to its own residents, and it is said that this is not to be considered a public use within the intent of the Constitution. As to the question thus proposed we can have no doubt or difficulty. The plain purpose of the Act is to secure all natural beds or bars for the public use, to which oyster areas owned by the State may be subjected, under laws now in force or hereafter enacted. There can be no doubt as to the public nature of the use to which such grounds are susceptible. The taking of oysters by the public, under license of the State, from lands and waters subject to its ownership and control, is undeniably a public use. * * * In order to answer that description *it is not necessary that the use, as to every natural oyster bar, shall be open to the public generally, but the right may be validly restricted to the citizens of the county within whose territory the fishery is located.* The principle was stated and applied in *Webster v. Pole Line Co.*, 112 Md. 429, that a public use need not be available to the whole public, and that it may be confined to the inhabitants of a designated locality, provided it is exercisable in common and is not limited to particular individuals." (Emphasis supplied.)

The chancellor was not correct in relying on *Cox* as being dispositive of the case at bar. The above quoted dictum from Judge Urner's decision was written within the frame of reference of the power of the State to condemn leasehold interests of State owned beds for public use, where the leases had previously been made by the State to private individuals. It is important to note that

the case which is cited in *Cox* as precedent, namely, *Webster v. Pole Line Co.,* 112 Md. 416, 429, 76 A. 254 (1910), was cited out of context and cannot validly be said to support the principle of law which *Cox* attributes to it. *Webster* was a public utility case and simply held that a public utility whose stock is privately owned may, through the exercise of eminent domain, acquire private property for a public use in a given or restricted area, the Court stating:

> " '* * * In determining whether the use is public or not, it is an immaterial consideration that the control of the property is vested in private persons who are actuated solely by motives of private gain. * * * The inquiry must necessarily be, what are the objects to be accomplished, not, who are the instruments for attaining them.' Nor need the use be for the whole public. 'It may be for the inhabitants of a small or restricted locality; but the use and benefit must be in common, not to particular individuals or estates.' " 112 Md. 429.

We think the Court in *Cox* made a poor choice of analogy in comparing the right of a privately owned public utility to exercise a public franchise in a given community with that of the right of the State to restrict a certain public use (such as the taking of oysters) to the residents of a specific county. There are a number of areas in which the analogy fails, but the most telling one is the consideration that a public utility must serve without discrimination all those within the area covered by its franchise which may be and usually is a limited area, whereas the State holds the title to fish in public waters in trust for the public, and all members of the public, regardless of where they may live in the state, have the right to take the fish subject to reasonable and nondiscriminatory regulations. In *Bradshaw v. Lankford,* 73 Md. 428, 431-432, 21 A. 66 (1891), our predecessors stated:

"* * * Now the oyster-beds within the waters of Somerset County do not belong to the people of that county. * * * They belong to the State, and * * * the Legislature, representing the sovereign power of the State, may pass laws regulating the taking of oysters within the waters of the State * * *."

See also *Browne v. Kennedy,* 5 H. & J. 195, 202, 203 (1821).

The anterior rationale upon which the "state ownership" theory rests was discussed at some length by the Supreme Court of the United States in *Toomer v. Witsell,* 334 U. S. 385, 92 L. Ed. 1460 (1948), wherein the Court stated:

"Appellees strenuously urge there is such an exception. Their argument runs as follows: Ever since Roman times, animals *ferae naturae,* not having been reduced to individual possession and ownership, have been considered as *res nullius* or part of the 'negative community of interests' and hence subject to control by the sovereign or other governmental authority. More recently this thought has been expressed by saying that fish and game are the common property of all citizens of the governmental unit and that the government, as a sort of trustee, exercises this 'ownership' for the benefit of its citizens. In the case of fish, it has also been considered that each government 'owned' both the beds of its lakes, streams, and tidewaters and the waters themselves; hence it must also 'own' the fish within those waters. Each government may, the argument continues, regulate the corpus of the trust in the way best suited to the interests of the beneficial owners, its citizens, and may discriminate as it sees fit against persons lacking any beneficial interest. Finally, it is said that this special property interest, which na-

tions and similar governmental bodies have traditionally had, in this country vested in the colonial governments and passed to the individual States."

"Language frequently repeated by this Court. appears to lend some support to this analysis." [Citing *Geer v. Connecticut*, 161 U. S. 519, 40 L. Ed. 793 (1896), wherein Mr. Justice White reviewed the historical development of the "common ownership" theory from ancient Greece to modern times.] 334 U. S. 399-400

In our opinion the dictum of *Cox* is inapposite to the case at bar and, as the lower court attempted to apply it, is repugnant to the doctrine of "state ownership." This leaves as the only remaining pillar upon which the opinion of the lower court leans for support, the traditional presumption of constitutionality attached to any act of the Legislature. *Cromwell v. Jackson*, 188 Md. 8, 28, 52 A. 2d 79 (1947).

Turning to the constitutionality of §§ 322 and 700 of Article 66C, we are mindful that "if a law is applied and administered by public authority 'with an evil eye and an unequal hand' so as to make unjust discriminations between persons in similar circumstances, material to their rights, such denial of equal justice is within the prohibition of the constitution." *Howard Sports Daily v. Public Service Commission*, 179 Md. 355, 358, 18 A. 2d 210 (1941). By the constitutional yardsticks given us in Article 23 of the Declaration of Rights of the Constitution of Maryland and the Fourteenth Amendment of the Constitution of the United States we are satisfied that the statutes in question are invalid in that they represent an unreasonable exercise of the police power.[4]

---

4. Art. 23, Declarations of Rights, Constitution of Maryland: "that no man ought to be * * * disseized of his freehold, liberties or privileges * * * or deprived of his life, liberty or property, but by the judgment of his peers or by the law of the land." The annotation following Art. 23, notes that "it prohibits discrimination in administration of law." Howards Sports Daily v. Public Service Comm., 179 Md. 355, 358, 18 A. 2d 210.

We think the statutes set forth an unlawful classification of persons and discriminate not only among the several watermen of the 13 tidewater counties in which crabs and oysters are found in marketable quantities, but also between residents of these counties and those who reside in Baltimore City and the 10 remaining counties of Maryland. In addition, we cannot see in what way the restrictive nature of the statutory provisions bears any reasonable relation to the public interest. Finally, from the undisputed testimony regarding the "gray area" into which the location of county water boundaries fall, there may be a question as to whether the statutes are susceptible of being fairly or reasonably enforced. Indeed, Professor Garrett Power in his excellent article, "More About Oysters Than You Wanted to Know," 30 Md. L. Rev. 199 (1970), expresses the thought at p. 216 that the only remedy for this legislative mishmash is a "constitutional catharsis."

In assessing the manner in which the statutes in question represent an unreasonable exercise of police power on the part of the Legislature we find a concise and modern guideline set forth in *Allied American Co., supra,* wherein we stated:

> "The due process clause does not, any more than the contract clause, inhibit a state from insisting that all contract and property rights are held subject to the fair exercise of the police power. *Atlantic Coast Line R. Co. v. City of Goldsboro,* 232 U. S. 548, 558, 58 L. Ed. 721. The exercise of the power is fair when the purpose is a proper public one and the means employed bear a real and substantial relation to the end sought and are not arbitrary or oppressive." 219 Md. 617.

And again in the same opinion we observed:

> "The constitutional need for equal protection does not shackle the legislature. It has the widest discretion in classifying those who are to be

regulated and taxed. Only if the grouping is without any reasonable basis, and so entirely arbitrary, is it forbidden. Abstract symmetry or mathematical nicety are not requisites. The selection need not depend on scientific or marked differences in things or persons or their relations. If any state of facts reasonably can be conceived that would sustain a classification, the existence of that state of facts as a basis for the passage of the law must be assumed. The burden is on him who assails a classification to show that it does not rest on any reasonable basis. *Wampler v. LeCompte,* 159 Md. 222, 225; *Maryland Coal & Realty Co. v. Bureau of Mines, supra; Tatelbaum v. Pantex Mfg. Corp.,* 204 Md. 360, 370." 219 Md. 623.

\* \* \*

Also in *Daniel Loughran Co. v. Lord Baltimore Candy Co., supra,* we said:

"\* \* \* our predecessors have consistently and zealously upheld and protected the right of the citizen to labor, to hold property and to contract with reference thereto, as well as his right of personal liberty. And except as to legislation enacted within the reasonable exercise of the police power and in the interest of the safety, health, moral, social or economic welfare of the body politic, this Court has at all times adhered to the principle of protecting the individual from unwarranted, unfair, burdensome, discriminatory and arbitrary legislation." 178 Md. 45.

Bearing these considerations in mind, we know of no reason, nor has the Commission afforded us with any explanation, as to how the restricting of watermen to earning their living in the county of their residence will further the safety, health, moral, social or economic welfare of the "body politic." The public interest may well have

been served had the design and intent of the statutes been to promote the conservation of the crabs and oysters in our waters. To be more specific, we fail to see just how it is a reasonable exercise of the police power of the State to enact a law that has the effect of depriving a waterman of Somerset County of his ability to earn a livelihood for his family when MSX or some other oyster blight depletes the oyster crop in that county, or when the elusive crab inexplicably shuns Somerset waters for those of another county.

We also view as unjust classification the restrictions found in the tonging statute which prohibits, under pain of criminal sanctions, a waterman of Somerset County from employing on his tong boat a hand, who, although an experienced waterman, resides in another county. Such a restriction is not only arbitrary but bears no relation to the public interest or any realistic connection with conservation. In *Dasch v. Jackson,* 170 Md. 251, 263, 183 A. 534 (1936) we said:

> "* * * while the legislation may * * * classify the persons to whom a prescribed regulation found to be necessary to the public welfare may apply * * * nevertheless the exercise of the power must have some real and substantial relation to the public welfare * * *."

Even in the area of private contract law this Court has exercised vigilance in protecting the right of a man to earn his livelihood by requiring a basis of reasonableness for the validity of a restrictive covenant in contracts of employment. *Ruhl v. Bartlett Tree Co.,* 245 Md. 118, 123, 124, 225 A. 2d 288 (1967). However, in § 700 the requirement of a twelve months' residence period before a waterman can apply for a tonging license in a given county has the effect of requiring a waterman of one county, who moves to another county while still remaining a resident of Maryland, to earn a living by some other means for an entire year before he is eligible to return to his occupation of crabbing and oystering in the county

to which he has moved. We think this restriction has no reasonable nexus with the public interest and is patently discriminatory.

In *Havre de Grace v. Johnson,* 143 Md. 601, 123 A. 65 (1923), the city of Havre de Grace attempted by ordinance to prevent nonresidents from engaging in the hacking business in the town by imposing a six months residence requirement on the right to carry passengers for hire. We said:

> "It certainly cannot be seriously argued that an ordinance which forbids non-residents of Havre de Grace from transacting on its streets the same business which they permit residents to transact there, is a reasonable regulation designed in the interest of the public health or welfare, because we certainly cannot assume as a matter of law that the operation of an automobile hiring business by a non-resident of Havre de Grace would, because of his non-residence, constitute a greater peril to the health or welfare of that town than it would if operated by a resident. A more reasonable and probable view would be that it was intended to confer the monopoly of a profitable business upon residents of the town. But whatever its purpose may have been, there can be no doubt but that the ordinance is discriminatory and unreasonable, and that the municipality had no power to adopt it." 143 Md. 608-609.

Although the 13 tidewater counties share a common bond and interest in the crab and oyster industry, yet, in any given season the provisions of §§ 322 and 700 may, as a factual matter, produce a non-uniform effect upon the industries in those counties. This disparate result may be occasioned by an oyster blight or the mysterious migratory habits of crabs which render the application of the law an undue burden on those watermen in the counties adversely affected. In such event, although the

Act on its face may appear non-discriminatory, yet, it produces as harsh and inequitable a result as though it were drawn and administered in a discriminatory manner.

Although there were no residents from the 10 non-tidewater counties as parties to this action, a statute should be measured not only by what has been done under its authority but what may be done. *Mahoney v. Byers,* 187 Md. 81, 87, 48 A. 2d 600 (1946) ; *Spann v. Gaither,* 152 Md. 1, 11, 136 A. 41 (1927). From this standpoint, the statutes have the effect of prohibiting the residents of non-tidewater counties from engaging in commercial crabbing and oystering, except by pot crabbing in the Chesapeake Bay (by Crab Regulation # 1 of the Department of Natural Resources) and oystering by dredge in the Bay (§ 702(b)). County waters are strictly off limits to the residents of the non-tidewater counties (except for pot crabbing) for the purposes of crabbing and oystering on a commercial basis. (Moreover, midway through § 322 one finds a real *non sequitur* in the proviso that "residents of Baltimore City may be licensed to catch crabs in Anne Arundel or Baltimore Counties.") It would further appear, that were all the residents of the State to be given the right to obtain a commercial license to crab and take oysters, this, of itself, would not necessarily be inimical to a conservation program based on reasonable and non-discriminatory restrictions. In *Dasch v. Jackson, supra,* we said:

> "Property, within the meaning of that guarantee [constitutional guarantee] includes the right to engage in those common occupations or callings which involve no threat to the public welfare, to exercise a choice in the selection of an occupation, and to pursue that occupation in his own way so long as he does not interfere with the rights of others." 170 Md. 263-264.

In *Maryland Coal and Realty Co. v. Bureau of Mines,* 193 Md. 627, 69 A. 2d 471 (1947) this Court in discuss-

ing legislation based on geographical and territorial classifications, stated:

"* * * it is equally clear that the power of the Legislature to restrict the application of statutes to localities less in extent than the State, as the exigencies of the several parts of the State may require, cannot be used to deprive the citizens of one part of the State of the rights and privileges which they enjoy in common with the citizens of all other parts of the State, unless there is some difference between the conditions in the territory selected and the conditions in the territory not affected by the statute sufficient to afford some basis, however slight, for classification." 193 Md. 642.

While it is true in the case at bar that a rational basis exists for distinguishing between tidewater and non-tidewater counties, yet the crab and oyster resources found in the tidal waters are common property held in trust by the State for all of its citizens, no matter in which part of the state they may live. To that extent an otherwise legitimate classification of residents which may be made for many purposes, cannot be made if it affects a right (in this case to the enjoyment and use of natural resources) which, as citizens of this State, they enjoy equally.

In holding §§ 322 and 700 unconstitutional, we do so with a keen awareness of the need for reasonable nondiscriminatory regulation in this sensitive area which directly affects the livelihood of several thousand watermen and the natural bounty of the Chesapeake Bay. We are heartened by the knowledge that legislation in its conceptual stage has been introduced in the General Assembly with the purpose of establishing meaningful controls. The drafting of legislation is within the exclusive sphere of the General Assembly. Whether the regulations imposed by legislation shall consist of the establishment of catch limits, the zoning of the Bay and its tributaries and estuaries, or other means, is not within the province

of the courts to decide. Our only admonition would be that, whatever controls may be adopted, they should be a reasonable exercise of the police power and apply to all citizens without disparity.

In this opinion we have endeavored to point out the manner in which §§ 322 and 700 of Article 66C of the Code unconstitutionally discriminates among the residents of the 13 tidewater counties of the State, and also between the residents of those counties and the 10 remaining counties and Baltimore City. A student of constitutional law will no doubt be disappointed that we chose to ignore the issue of whether §§ 322 and 700 violated the due process or equal protection or privileges and immunities of non-residents of this State who may wish to crab or take oysters commercially in Maryland waters.

Professor Power, in his article in 30 Md. L. Rev. 199 at 221, treats upon this very issue. However, we hasten to point out that in the case at bar we did not have before us the question of the statutes being violative of any of the rights of non-residents of Maryland, and we are of the opinion that in arriving at our conclusion in this case it is not necessary for us to reach that point. It is a question, however, which may trouble those drafting new legislation, and for whatever guidance it may prove to be, were we to have considered this issue, we would rely on *McCready v. Virginia*, 94 U. S. 391 (1876), wherein the United States Supreme Court held that the State of Virginia could make it a crime for a citizen of another state (in that case Maryland) to plant and to take oysters in Virginia waters. The Court in *McCready* adopted the theory that the right of Virginia citizens to plant and take oysters was not just a privilege of citizenship which would come under the protection of the privilege and immunities clause but a prerogative incident to their collective ownership of oysters. The Court stated:

> "The principle has long been settled in this court, that each State owns the beds of all tide-

waters within its jurisdiction unless they have been granted away. * * * In like manner, the States own the tide-waters themselves, and the fish in them, so far as they are capable of ownership while running. For this purpose the State represents its people, and the ownership is that of the people in their united sovereignty. *Martin v. Waddell,* 16 Pet. 410. * * * These remain under the control of the State, which has consequently the right, in its discretion, to appropriate its tide-waters and their beds to be used by its people as a common for taking and cultivating fish, so far as it may be done without obstructing navigation. Such an appropriation is in effect nothing more than a regulation of the use by the people of their common property. The right which the people of the State thus acquire arises not from their citizenship alone, but from their citizenship and property combined. It is, in fact, a property right, and not a mere privilege or immunity of citizenship." 94 U. S. 394-395.

While it is true that the Supreme Court of the United States has spoken slightingly of *McCready,* it has never seen fit to overrule it, although it appears to have had the opportunity to do so in *Toomer v. Witsell,* 334 U. S. 385 (1948). There, the Supreme Court was concerned with the constitutionality of certain South Carolina statutes which sought to regulate commercial shrimp fishing in the 3 mile maritime belt off the coast of that state. In striking down that portion of the statute which proposed to place a $2,500 license fee on a non-resident fisherman, as contrasted with a $25 fee imposed on a resident of South Carolina, the Court stated:

"It will be noted that there are at least two factual distinctions between the present case and the *McCready Case.* First, the McCready case related to fish which would remain in Virginia

until removed by man. The present case, on the other hand, deals with free-swimming fish which migrate through the waters of several states and are off the coast of South Carolina only temporarily. Secondly, the *McCready Case* involved regulation of fishing in inland waters, whereas the statute now questioned is directed at regulation of shrimping in the marginal sea.

"Thus we have, on the one hand, a single precedent which might be taken as reading an exception into the privileges and immunities clause and, on the other, a case which does not fall directly within that exception. Viewed in this light, the question before us comes down to whether the reasons which evoked the exception call for its extension to a case involving the factual distinctions here presented.

"However satisfactorily the ownership theory explains the *McCready Case,* the very factors which make the present case distinguishable render that theory but a weak prop for the South Carolina statute. That the shrimp are migratory makes apposite Mr. Justice Holmes' statement in *Missouri v. Holland,* 252 U. S. 416, 434, 64 L. Ed. 641, 648, 40 S. Ct. 382, 11 A.L.R. 984 (1920), that 'To put the claim of the State upon title is to lean upon a slender reed. Wild birds are not in the possession of anyone; and possession is the beginning of ownership.' Indeed, only fifteen years after the McCready decision, a unanimous Court indicated that the rule of that case might not apply to free-swimming fish. The fact that it is activity in the three-mile belt which the South Carolina statute regulates is of equal relevance in considering the applicability of the ownership doctrine. While *United States v. California,* 332 U. S. 19 (1947), as indicated above, does not preclude all statute regulation of activity in the marginal

sea, the case does hold that neither the thirteen original colonies nor their successor States separately acquired 'ownership' of the three-mile belt.

` "The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource. And there is no necessary conflict between that vital policy consideration and the constitutional command that the State exercise that power, like its other powers, so as not to discriminate without reason against citizens of other States.

"These considerations lead us to the conclusion that the *McCready* exception to the privileges and immunities clause, if such it be, should not be expanded to cover this case." 334 U. S. 401-402.

We, however, take sustenance from the language found in the concurring opinion of Mr. Justice Frankfurter and Mr. Justice Jackson in *Toomer v. Witsell, supra,* wherein they recognized the viability of *McCready*, stating:

"* * * A State may care for its own in utilizing the bounties of nature within her borders because it has technical ownership of such bounties or, when ownership is in no one, because the State may for the common good exercise all the authority that technical ownership ordinarily confers.

"When the Constitution was adopted, such, no doubt, was the common understanding regarding the power of States over their fisheries, and it is this common understanding that was reflected in *McCready v. Virginia,* 94 U. S. 391. The *McCready Case* is not an isolated decision to be looked at askance. It is the symbol of one

of the weightiest doctrines in our law. It expressed the momentum of legal history that preceded it and around it in turn has clustered a voluminous body of rulings. Not only has a host of State cases applied the *McCready* doctrine as to the power of States to control their game and fisheries for the benefit of their own citizens, but in our own day this Court formulated the amplitude of the *McCready* doctrine by referring to 'the regulation or distribution of the public domain, or of the common property or resources of the people of the State, the enjoyment of which may be limited to its citizens as against both aliens and the citizens of other States.' " 334 U. S. 408-409.

In evaluating *Toomer v. Witsell,* we do so within the frame of reference as to what may be discriminatory regulations regarding commercial fishing rights in the marginal sea bounding the coastline of a state, and would not deem it authority out of such context. Additionally, although Professor Power in his article pronounced *McCready* "functionally dead," we, in view of the life breathed into it in the concurring opinion in *Toomer v. Witsell,* consider it still among the quick and will continue to do so until its obituary appears among the Supreme Court Reports.

In the court below and again on appeal, the appellants attacked the constitutionality of the statutes on the ground of vagueness and indefiniteness of the county water boundaries which rendered secs. 322 and 700 unsusceptible of enforcement. We find it unnecessary to reach this issue in holding the statute unconstitutional. Furthermore, were the determination of this issue necessary to a decision in this case, we would be compelled to remand the case to the chancellor for the taking of further testimony on this point, as the present state of the record reveals that the location of county water boundaries was not pursued in depth nor was the historical back-

ground of this complex subject developed sufficiently to bring the dispute into focus. The determination of the location of county water boundaries presents too profound a question to be decided in a case where their location is not the paramount issue and their delineation not vital to the decision.