## REDDICK *v.* STATE

(Two Appeals in One Record)

[No. 146, October Term, 1956.]

20

*Decided April 9, 1957.*

*Motion for rehearing filed May 8, 1957, denied May 9, 1957.*

22

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*John J. O'Connor, Jr.,* for the appellant.

*Norman P. Ramsey, Deputy Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General,* and *James H. Norris, Jr., Special Assistant Attorney General,* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

A bill for declaratory decree and injunction was filed on June 26, 1956, by the State of Maryland on relation of the Attorney General against Drs. Robert H. Reddick, Marcos Jiminez, Robert Dwight Brown, Lloyd W. Hughes, Simon Virkutis, Alexander Mozzer, Yuen K. Yuan, and William C. Harrison, who were purporting to act as the Board of Medical Examiners of the State of Maryland (Board), representing the Maryland State Homeopathic Medical Society. A temporary injunction was issued thereon by an order of Judge Oppenheimer of the Supreme Bench of Baltimore City. The next day, a companion case was filed against those who held themselves out as the officers of the Maryland State Homeopathic Medical Society (Society). The temporary injunction was extended, after a hearing on July 3, 1956, until the final determination of the case. The appellant filed combined demurrers and answers and the cases were heard before Judge Byrnes. After a prolonged hearing, the Judge rendered his opinion and signed a decree in each case. In the suit against the Board, the decree permanently enjoined the defendants from acting as the Board of Medical Examiners (Homeopathic), and from conducting, continuing to conduct and completing any examination under the purported authority of such Board, and they were further prohibited from

issuing any licenses that would authorize the practice of medicine or surgery under the purported authority of said Board. The decree, also, enjoined Reddick from acting or purporting to act as Secretary-Treasurer of said Board. In the suit against the Society, Dr. Virkutis, President, and Reddick, Secretary-Treasurer, were enjoined from acting as officers of the Society to give examinations "allegedly qualifying persons to practice medicine" in Maryland, and from affixing the Society's Seal to any such license.

The Record Extract contains 551 pages, but it will be unnecessary to make this opinion correspondingly lengthy. For some years before, and at, the turn of the century there had been and was a division of opinion among the respectable members of the medical profession. One faction favored the practice of homeopathic medicine and the other group preferred the allopathic treatment of human illness. As a result, the legislature in 1902 (Art. 43, Sec. 118) named two separate and independent licensing boards with authority to issue licenses to practice medicine in this State. The board that represented the allopathic point of view was to be designated by the Medical and Chirurgical Faculty of the State of Maryland, and the one that represented the homeopathic viewpoint was to be selected by the Maryland State Homeopathic Medical Society. With the course of time and the commendable and universally recognized advances in medical science, the allopathic group became dominant in membership, and the homeopathic following dwindled in size and in activities. By the years 1948, 1949, and 1950, the latter had become more or less moribund, and there were few, if any, candidates for examination. In 1951, Dr. Evans, a distinguished physician, who was both Secretary of, and a vital force in, the Society, died. For a time, this seems to have been the death knell of the Society. There is no record of its holding any meeting, after one that was held on May 10, 1950, the last one attended by Dr. Evans, until May 23, 1954, when the Society met for its 79th annual meeting. Just a few months prior thereto, in January, 1954, Dr. Evans' daughter had turned over, with the authority of the remaining members of the Board, all of its records to the Hall of

Records. She retained, however, the minute books and the constitution and by-laws of the Society.

The record does not disclose with certainty just when Reddick conceived his nefarious scheme, which now will unfold quickly, but at this "reorganization and rejuvenation" of the Society held on May 23, 1954, he was most active and succeeded in being elected to the office of Secretary of the Society, as well as one of the eight members of the Board. It was at this meeting that the group, claimed by the Attorney General to be the legally constituted Board (subject to resignations, *et cetera*) was elected. At the Society's annual meeting of 1955, held in Washington, D. C., a resolution was passed "that the officers of the Society and the Board * * * continue in office until 1956 * * *".

In due course, the Board scheduled examinations for qualified applicants for licensure on December 12th, 13th and 14th of 1955. Reddick, in the meantime, had shown an unusual interest in establishing the qualifications of the graduates of two schools for taking the examination, although he had received competent advice that neither of the two schools was accredited by any authoritative body, and their graduates could not lawfully qualify for the examinations. Reddick, however, without the knowledge or consent of the other Board members gave the December examinations to twenty-three candidates, none of whom seems to have had the requisite qualifications to take them. The evidence developed the fact that some of the applicants paid or "contributed" to the "Society" four hundred dollars or more, which was immediately subject to Reddick's control. Dr. Chepko, who was the President of the Society, became disturbed and alarmed, and notified the Attorney General that Reddick had given these examinations. Reddick, as Secretary, acting on the alleged authority of a fraudulent constitution and by-laws of the Society (which will be mentioned below), and as a reprisal, purported to remove Dr. Chepko as President of the Society and as a member of the Board. Upon the advice of the Attorney General, Dr. Chepko refused to acknowledge this action of Reddick as valid. Reddick, still acting alone, purported to make Dr. Virkutis, his subordinate on the staff of

the Eastern Shore State Hospital, a member and president of the Board, and got Virkutis to *sign 35 to 45 blank licenses* to practice medicine. Shortly thereafter, without calling a Board meeting, Reddick issued six licenses to practice medicine in this State, presumably from those which were signed in blank. Dr. Chepko then called a meeting of the Board at which Reddick was removed as its Secretary-Treasurer. The Board also authorized the Attorney General to bring action in Dorchester County to require Reddick to give up the Board's books and records.

On April 8, 1956, there was held what purported to be the 81st annual meeting of the Society, apparently at the instigation of Reddick. The minutes show that 30 persons were present, but only five residents of Maryland attended in person, and two other such residents were present by proxy. All of the others were non-residents. Every one of the applicants who had taken the December examinations was present in person or by proxy, and every motion at the meeting was made and seconded by one of such applicants. At this meeting, the action of Reddick in attempting to expel Chepko was purportedly ratified, and Drs. Swartwout, Watson, Simon and Follweiler purportedly were expelled, and four new men named to be on the Board of Medical Examiners in their places, namely, Drs. Jiminez, Brown, Hughes and Virkutis.

On May 31, 1956, during the litigation in Dorchester County, Reddick resigned as Secretary-Treasurer of the Board and of the Society. Two days thereafter, according to Reddick, a special meeting of the Society was purportedly held, although no notice was given to the membership as required by the By-laws. It was attended by only five persons besides Reddick, who was the only Maryland resident there. He claims the meeting reinstated him to the offices previously held by him. It is very doubtful that this meeting ever was held. On June 4, 1956, Dr. Chepko's board met and invalidated the December examinations, and elected Dr. Simon to fill the vacancy in the office of Secretary-Treasurer created by Reddick's dismissal and resignation. Reddick continued to issue the licenses to practice medicine, and,

in the latter part of June, 1956, when these suits were filed, was conducting examinations for fifty-nine applicants, few, if any, being qualified to take such examinations in Maryland.

There was offered by the appellee, Exhibit 18A, which purported to be the real Constitution and By-laws of the Society, and Reddick, likewise, introduced a purported Constitution and By-laws, that delegated to him almost regal powers. Of this last instrument, Judge Byrnes said it is "a palpably fraudulent document"; and of Reddick's testimony, he stated it is "unworthy of belief in general". With these findings of the Chancellor, we are in complete accord.

I

As a result of the above events, there were two boards of medical examiners, each claiming to represent the Society. The first board, sanctioned by the Attorney General, had its origin in the 79th annual meeting of the Society. As of the date of the filing of these suits, its membership, after allowance for resignations, allegedly consisted of Drs. Simon, Follweiler, Harrison, Watson and Chepko. The claim of this group (Chepko's board) to be the legal board rests upon the validity of the actions taken at the 79th annual meeting, and the invalidity of the actions of Reddick and the purported actions of the 81st annual meeting. The second board (Reddick's board), on the other hand, rests its claim that it constitutes the legal board upon the validity of the 81st annual meeting, and some supposed action taken at a purported meeting on June 2, 1956.

The Chancellor decided that Dr. Chepko's board was the legally constituted Board. Appellant makes no contention that the 79th annual meeting of the Society was improper or illegal in any manner. As a matter of fact, it was at this meeting he was elected Secretary-Treasurer of the Society and a member of the Board. There, likewise, seems to be no dispute over those who were selected at this meeting as members of the Board, namely, Drs. Swartwout, Reddick, Chepko, Croissant, Harrison, Watson, Shamer (Shamer resigned shortly thereafter, and his place was filled by Dr. Follweiler) and Simon. The statute, Art. 43, Sec. 118, provides that

the Board shall be selected at the annual meetings of the Society; and that each member shall serve for four years, or until his successor is appointed and qualified. Consequently, those elected to the Board at the 79th annual meeting held on May 23, 1954, and who have not resigned or who have not legally been removed, are still members of the Board. The members of the Society had no authority to vary this provision of the statute in regard to the length of the term of office of the Board members.

Further, the purported 81st annual meeting of the Society held on April 8, 1956, and the purported meeting thereof held on June 2, 1956, were not called at the request of the duly constituted authority of the Society, nor were notices given in accordance with the By-laws; therefore, insofar as any action taken at either of these meetings attempts to affect the Society or the Board, such action is a nullity. Without hesitation, we confirm the ruling of the Chancellor that Dr. Chepko's Board is the legally constituted Board.

II

The appellant contends that the Chancellor erred when he refused to allow the witness, Hough, to play the transcriptions of instruction in medicine at Fremont College, one of the schools that had graduated some of the applicants who had taken, and were taking, the examinations sponsored by Reddick. Whether the study of medicine was properly and competently conducted at this college was irrelevant. Neither the relief requested nor that granted raised this issue. We hold the Chancellor was correct in this ruling.

III

The appellant further contends the Attorney General was not a proper party to this suit and had no authority to institute the same. Art. V, Sec. 3 of the Maryland Constitution reads, in part, as follows:

"It shall be the duty of the Attorney-General to prosecute and defend on the part of the State all cases, * * * and he shall commence and prosecute or defend any suit or action in any of said Courts,

on the part of the State, which the General Assembly
or the Governor, acting according to law, shall direct
to be commenced, prosecuted or defended * * *."

When the suits were filed, the Attorney General had no directive from the Governor or the Assembly to commence or prosecute the same; but, shortly thereafter, he received a written directive from the Governor to prosecute the "cases to conclusion". The appellee claims, (1), that as the Attorney General of the State, he has the right and the duty to institute and prosecute all proper suits for and on behalf of the State, without any request from the Governor or the Assembly, that the above section of the Constitution does not limit his powers, but compels him to commence, prosecute or defend actions when directed to do so by the Governor or the Assembly; and, (2) that if he be wrong as to (1), he had the right and the duty to prosecute the suits after obtaining the above mentioned directive of the Governor. We find it unnecessary to rule upon (1) as we agree with (2). If we assume without deciding that the Attorney General had no authority to commence the actions without the Governor's or the Assembly's command, we think the Governor's subsequent written directive to prosecute the suits was a sufficient confirmation and ratification of the Attorney General's action in instituting the suits; and, together, they constituted a compliance with said Sec. 3 of Art. V of the Maryland Constitution. We, therefore, hold the State of Maryland, upon the relation of the Attorney General, was properly a party in both of the suits.

IV

The appellant next contends that the second suit, the one against the Society, was based on the allegation that the Society was conducting the examinations instead of the Board, and there was no proof of this allegation. We find no merit in this contention.

The only defendant below, involved in this appeal, is Reddick. He was enjoined from acting as an officer of the Society "to give examinations allegedly qualifying persons to practice medicine" in Maryland; from continuing to conduct

any such examination; and, from acting to affix the Society's Seal to any license to practice "medicine and surgery" in this State. In this Court's opinion, Reddick's conduct was reprehensible in the extreme. The evidence establishes, beyond doubt, a fixed, determined and inexorable disposition on his part to give the examinations under any guise or pretext whatsoever; that he had planned and was conducting the June examinations with the idea of making it impossible for legal process to reach members of his purported Board; and, that he (Reddick) had attempted to place the handling of these examinations under the control of three December examinees, all non-residents of the State, but purported members and/or officers of the Society, although not members of Reddick's purported Board. It was these same three who were supposed to have marked the examinations. And the sheriff's office representatives, when they attempted to serve process in the first suit, were advised that the meeting where the examinations were being conducted was a private meeting and not a Board meeting. Without laboring the point further, we think there was ample evidence in this suit upon which to enjoin Reddick in the manner indicated above.

## V

The appellant's final claim of error is that necessary parties to the proceedings were not joined. He first contends that in the suit against the Board, a declaration was prayed to establish Dr. Chepko's Board as the valid and subsisting Board of Medical Examiners; so, if the defendants below had been successful, and had been declared the legitimate Board, the members of Dr. Chepko's Board would have had their rights affected and adjudicated, and, therefore were necessary parties, and his demurrer should have been sustained. Sec. 11 of the Declaratory Judgments Act (Art. 31A) provides, in part: "* * * all persons shall be made parties who have or claim any interest which would be affected by the declaration, * * *"; and the general rule, in equity, is that all persons should be made parties who are legally or beneficially interested in the suit. *U. Slate Wkrs. v. Carpenters, etc.,* 185 Md. 32, 36, 37, 42 A. 2d 913; *Md. Natur. Ass'n*

*v. Kloman,* 191 Md. 626, 628-632, 62 A. 2d 538; *Ashman v. Schecter,* 196 Md. 168, 173, 76 A. 2d 139; *Givner v. Cohen,* 208 Md. 23, 31, 32, 116 A. 2d 357. Cf. *Kilroy v. O'Connor* (Mass.), 85 N. E. 2d 441. If we assume, without deciding, the members of Dr. Chepko's Board were necessary parties, we think any ruling thereon has been cured. The object of the rule that requires all necessary parties to be joined is to be sure that no one's rights are adjudicated unless he has had his "day in Court"; and that there will be a complete determination of the matters in dispute in one suit (this latter being subject to certain exceptions not here pertinent). All of the membership of Dr. Chepko's Board testified in the present case. They were fully aware that it was being conducted, and what was involved therein. There is a well established principle of law that a person who has full knowledge of pending litigation and that it affects, and will determine, his rights, and, who is entitled to appear, but who makes no effort to intervene as a party, and permits a conclusion thereof without objection, such person is concluded by the proceedings as effectually as if he were named on the record. *Albert v. Hamilton,* 76 Md. 304, 311, 25 A. 341; *Rody v. Doyle,* 181 Md. 195, 200, 29 A. 2d 290. Cf. these, *Parr v. State,* 71 Md. 220, 235, 17 A. 1020; *Riley v. First Nat'l Bk.,* 81 Md. 14, 26, 27, 28, 31 A. 585; *Lichtenberg v. Sachs,* 200 Md. 145, 159, 88 A. 2d 450. As we think the members of Dr. Chepko's Board are bound by the decree passed, we hold there was no reversible error in overruling the demurrer in the suit against the Board.

The appellant next claims that the bill against the Society requested a declaration that examinations given by the Society for licensure of any person to practice medicine were invalid. He contends this meant that certain licenses would be invalidated, so these license holders should have been made parties. He further claims that the Chancellor failed to require them to be made parties over his protest. The record does not seem to bear out this contention. The bill against the Society referred only to examinations that were to be given on June 25th, 26th and 27th and were *then in progress.* No licenses were alleged to have been issued, and the suit

was in anticipation of preventing any such issuance. When the demurrer to said bill was filed by the appellant and when heard by the Chancellor, the only claimed improper party was the Attorney General; and the situation was the same when the appellant made a motion to dismiss just prior to the taking of testimony. We are unable to say from the record, that this question was raised and passed upon by the Chancellor, therefore, under former Rule 9, we are not at liberty to consider the same.

This disposes of all of the contentions of the appellant, but it is noteworthy that the Chancellor, in his opinion, made certain findings of fact and conclusions of law. These findings of fact and conclusions of law were repeated, as recitals, in the decrees themselves. The decree of a court of equity, and not its opinion, is the instrument through which it acts in granting relief. *Alleghany Corp. v. Alde. Corp.*, 173 Md. 472, 478, 196 A. 418. It is not necessary that a declaratory judgment be in any particular form, as long as the Court, *by its decree*, actually passes upon or adjudges the issues raised by the pleadings. *Carter et ux. v. Nance, et ux.* (Ky.), 200 S. W. 2d 457, 459. And, in this regard, a finding of fact by the Court, unless it be included in the decree, is not the decree of the Court. *Employers Ins. Co. v. Brooks* (Ala.), 33 So. 2d 3, 5. *Alleghany Corp. v. Alde. Corp., supra*, p. 480 of 173 Md.

This opinion is specifically rendered without prejudice to the rights or obligations of the so-called "Reddick licensees".

*Decrees affirmed, with costs.*