## TRANSAMERICA INSURANCE COMPANY *v.*
## MARY BROHAWN ET AL.

[No. 892, September Term, 1973.]

*Decided October 18, 1974.*

The cause was argued on May 24, 1974, before ORTH, C. J., and POWERS and DAVIDSON, JJ., and reargued en banc on September 16, 1974, before ORTH, C. J., and MORTON, THOMPSON, MOYLAN, GILBERT, MENCHINE, DAVIDSON, MOORE and LOWE, JJ.

*Edward C. Mackie,* with whom were *Robert W. Fox* and *Rollins, Smalkin, Weston & Andrew* on the brief, for appellant.

*Francis J. Meagher,* with whom were *Goodman, Meagher & Enoch* on the brief, for appellees.

ORTH, C. J., delivered the opinion of the Court. LOWE and DAVIDSON, JJ., dissent and LOWE, J., filed a dissenting opinion in which DAVIDSON, J., concurs at page 207 *infra.*

The efforts of Mary F. Brohawn and Martha J. Schmidt to remove their grandmother, Ethel Rosier, from a nursing home resulted in their being prosecuted for criminal offenses and sued for damages. Mrs. Rosier had been a resident of the Weeks-Cuppett Nursing Home [1] in Oakland, Maryland, for some four years, admitted originally by her son, Robert. Mrs. Brohawn, her nineteen year old son, Mark, and Mrs. Schmidt went to the Home on 24 November 1970. They did so, according to Mrs. Brohawn, because Mrs. Schmidt "talked with the Director at the nursing home, and

---

[1]. The Home is variously referred to in the record before us as Weeks-Cuppett, Cuppett-Weeks, Graham-Weeks, Cuppett, and Weeks Nursing Home.

he told her to come up and get my grandmother within thirty days or he was going to set her out in the street." There are two disparate versions of what took place after they arrived at the Home. We shall refer to one as the Brohawn-Schmidt version, and the other, because Clara C. Shaffer and Mary Jane Friend, two employees of the Home, were directly involved, as the Shaffer-Friend version. Both versions are gleaned from the transcript of the proceedings in the criminal trial in the Circuit Court for Garrett County at which Mrs. Brohawn and Mrs. Schmidt were jointly tried, and from the answers to interrogatories filed in the civil actions brought by Mrs. Shaffer and Mrs. Friend against Mrs. Brohawn and Mrs. Schmidt.

According to the Shaffer-Friend version, as supplied by Regina Gank, an employee of the Home, the Brohawn entourage arrived about lunchtime. Mrs. Gank asked them to be seated while Mrs. Rosier ate her lunch, "that we did not allow nobody in while eating, and they insisted on going in, they went in and sit down." Mrs. Gank went to get Mrs. Shaffer and Mr. Weeks, one of the owners of the Home. "So, then at the time, Mr. Weeks came over and Mrs. Shaffer, they must have seen them and got out in the lobby again." After Mrs. Rosier finished lunch, Mrs. Gank told Mrs. Brohawn and her party that they could go in. "[F]irst thing I know, one of the aides come to me and said they are taking Mrs. Rosier out. . . . I said, they can't take her out, the one that signs her in is the one that is supposed to take her out." Mrs. Brohawn and Mrs. Schmidt "said some foul language . . . . And they said they were going to take her out, nobody was going to stop them". Mrs. Gank went again to get Mrs. Shaffer. When they got back, Mrs. Brohawn, Mrs. Schmidt, Mark and Mrs. Rosier were "outside of the door." Mrs. Shaffer got hold of one arm of Mrs. Rosier and Mrs. Gank got hold of the other arm. Mark hit Mrs. Gank, and ". . . about that time, Mrs. Shaffer was falling down the cement steps. The Brohawn forces succeeded in leaving with Mrs. Rosier, who was "pulling back."

Mrs. Shaffer said she was working in another Annex when called by Mrs. Gank. Mrs. Brohawn and Mrs. Schmidt

". . . were pacing up and down the hall, and they were using profane language. . . . So, we tried, I even tried to talk to them, so, I went over to the other side again and thought everything was all right, and then Mrs. Gank came back and called me again and said they were taking her out of the building. So, I proceeded to go back to the building again. And both — they had her out to the door and were going on the outside of the door. So, Mrs. Gank and I both grabbed her, one on each side of the arm, and, of course, that is when we had a little tussel, and I was jerked around by the uniform and fell against the arm-railing and hit my side and on down to the bottom floor." She identified Mrs. Brohawn as the one who "jerked her around." Answering the interrogatories she put it a little differently: " [T]he defendant either intentionally struck and assaulted her or carelessly and negligently struck and assaulted her, causing her to fall back against an iron railing and fall down the steps to the ground, sustaining personal injury."

Mrs. Friend was on duty when the attempt was made to remove Mrs. Rosier. Mrs. Brohawn and Mrs. Schmidt " . . . both came in and . . . tried to take Mrs. Rosier out, and I tried to stop them at the first door to keep them from taking Mrs. Rosier. And Mrs. Rosier said, I do not want to go, that she is good to me and she feeds me, and at that time, she hauled off and hit me on the arm and knocked me back where we have our coats hanging in the cloakroom there." It appeared from the cross-examination of Mrs. Friend that the person who hit her was Mrs. Brohawn. She also said she saw Mark hit Mrs. Gank.

According to the Brohawn-Schmidt version there was no altercation, no one fell down the steps and no one was struck by anyone. At the criminal trial, Mrs. Brohawn, as we have indicated, testified that she went to the Home because her sister " . . . talked with the Director at the nursing home, and he told her to come up and get my grandmother within thirty days or he was going to set her out in the street. This woman has ran away a number of times and has been brought back by police, and this should be on the police dockets. This woman was very unhappy at this nursing

home, and she did not want to be there. She did not put up any struggle when we left. She said none of the things that was said here." She recounted what happened:

"Well, they said she was having her lunch, and when the woman came — the woman said she was having her lunch came out, my sister went into the room, and all she had was a fourth of a glass of water sitting in front of her.

* * *

Well, I followed my sister—after I heard my sister talking to her, then I also went into the room, and when I got in there, my grandmother was tied and roped to the bed. So, when I saw this, I was very upset and I started untying her, and I did untie her. And then I asked my son to help me because the knots were so tight that it was impossible for me to do it by myself. So, my son helped me untie her, and we got her to her feet, and she was very glad to see me, and she said that she thought we had given her up for lost, she thought she was in there forever, for lost. And I asked where her coat was, and she said, am I going home, and I said, Grandma, we're going home. I said, you're going to be happy once again, and I'm not lying, your Honor, because I've got a Creator to answer to.

* * *

We walked completely out, and the little lady with me — the bad — you know, she had the stutter, she said that someone — said to someone that Mrs. Rosier is leaving, and this lady said, well, let them go, don't stop them. Nobody stopped us, we walked out the door, your Honor, we walked to our car and left. Nobody stopped us. And that lady, the blonde lady said, let them go, and then she — after we got outside, she yelled, she says, well, I'm going to call the police, and I says, well, I dare you. And as God is my witness, she will have to answer for her soul for her lying, not me."

Mrs. Brohawn's answers to interrogatories propounded to her were substantially the same as her testimony. She explained the Mark-Gank episode. Mrs. Gank " ... placed her hand on the shoulder of Mark Brohawn to detain him and was told to take her hands off. . . . When Mark Brohawn told Mrs. Gank to remove her hand from him, he shrugged his shoulder to loosen the grip she had on him; but aside from this there was no personal contact between the parties known to this defendant."

## The Criminal Prosecutions

On 9 March 1971 criminal informations were filed in the Circuit Court for Garrett County charging that Mrs. Brohawn and Mrs. Schmidt kidnapped Mrs. Rosier and that they assaulted and beat Mrs. Shaffer and Mrs. Friend. When the informations came on for trial on 24 March, Mrs. Brohawn and Mrs. Schmidt pleaded guilty to the assault charges. The pleas were accepted and guilty verdicts were entered. As to each, a jail sentence of 30 days was suspended upon payment of a fine of $100 and costs. The kidnapping charges were dismissed.

## The Civil Actions for Damages

On 8 September 1971 Mrs. Shaffer and Mrs. Friend sued Mrs. Brohawn, Mrs. Schmidt and Frederick W. Schmidt [2] in the Circuit Court for Garrett County, alleging that Mrs. Brohawn and Mrs. Schmidt "willfully and maliciously and without any just cause or provocation" made an assault upon Mrs. Shaffer and Mrs. Friend and "beat, wounded and ill-treated" them, causing them "to suffer serious, painful and permanent injuries". Compensatory and punitive damages were claimed. On 14 September 1971, upon suggestion by the Schmidts, the cases were removed to the

---

2. Frederick W. Schmidt, the husband of Martha J. Schmidt, was not present at the time of the incident at the Home. The attorney for Transamerica Insurance Company, see *infra*, explained: "Apparently there was a mistake in identity as to Mark Brohawn so that Mr. Schmidt was joined as a Defendant but apparently had nothing whatever to do with this incident." Mark was not named as a defendant in the civil suits for damages, and it does not appear that criminal charges were filed against him.

Circuit Court for Allegany County for trial. Maryland Rule 542. On 3 November 1971 amended declarations were filed, adding a second count alleging that the injuries were incurred due to the negligence of Mrs. Brohawn and the Schmidts. These tort actions have not as yet been tried.

*The Declaratory Judgment Proceeding*

The Superior Risk Insurance Company issued policy No. 47 89 88 to Mrs. Brohawn and her husband as the insured, effective for three years from 11 June 1969. Superior Risk was a subsidiary of the Ohio Farmer's Company. Transamerica Insurance Company acquired the Maryland policies of Superior Risk in 1969, according to a certification in the record by Transamerica. Under paragraph a, entitled "Coverage E — Personal Liability", subsection 1 ("Insuring Agreements"), Section II of the policy, the Company agreed with the named insured:

> "To pay on behalf of the insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, and the Company shall defend any suit against the Insured alleging such bodily injury or property damage and seeking damages which are payable under the terms of this Section, even if any of the allegations of the suit are groundless, false or fraudulent; but the Company may make such investigation and settlement of any claim or suit as it deems expedient."

Paragraph c, subsection 2 ("Exclusions"), Section II, provided that the Section did not apply "to any act committed by or at the direction of the Insured with intent to cause injury or damage to person or property."

Counsel for the Brohawns wrote Transamerica under date of 3 November 1971 enclosing the amended declarations filed by Mrs. Shaffer and Mrs. Friend. Pointing out that "the Second Count clearly claims damages 'which are payable under the terms' of your policy", he requested that arrangements be made "for the defense of this action under

the policy." Transamerica's claims manager wrote Mr. and Mrs. Brohawn on 14 March 1972. The letter, in relevant part, read:

"I am writing this letter to inform you that any action taken by the Transamerica Insurance Company, to determine the cause and other facts pertaining to the above captioned incident which occurred on or about November 24, 1970, and in investigating the cause and other facts thereof, shall not waive or invalidate any of the conditions of the policy or policies of insurance that you have with this company and shall not waive or invalidate any rights whatever of any party to this agreement. The sole objection and intent of this agreement is to provide for the determination of the cause and other facts pertaining to the said loss or accident and any investigation thereof, and preserve all rights of all the parties thereto."

On 14 May 1973 Transamerica instituted a proceeding at law in the Circuit Court for Allegany County against Mary Brohawn, Mark Brohawn, Clara C. Shaffer, Mary Jane Friend, Frederick W. Schmidt and Martha Schmidt under the Uniform Declaratory Judgments Act of Maryland. Courts and Judicial Proceedings Article (Courts Art.) §§ 3-401 to 3-415, inclusive. It sought a declaration of the rights of the parties under the insurance contract. Specifically it prayed for "A Declaratory Judgment that Plaintiff has no coverage under the policy hereinabove set forth or any liability that may be adjudged against Defendants MARY BROHAWN and MARK BROHAWN for injuries to Defendants SHAFFER and FRIEND as a result of any acts committed by Defendants BROHAWN on or about November 24, 1970 and which are the subjects of the suits hereinabove described; and that Plaintiff is relieved of any obligation to defend Defendants BROHAWN in said suits." It also requested that Mrs. Shaffer and Mrs. Friend be enjoined "from prosecuting any action in a Circuit Court for Allegany County in accordance with the applicable provision

of the Maryland Rules of Procedure." A hearing was had on the declaratory judgment proceeding on 23 August 1973. On 7 November the court issued an order ". . . that the Petition for declaratory judgment on behalf of Transamerica Insurance Company, be, and the same is hereby denied. The matter of coverage will be determined by the jury's verdict on issues submitted as to the manner in which the injuries, if any, were sustained and the Transamerica Insurance Company shall defend the insured under the non-waiver agreement executed between the parties. Costs to be deferred pending trial on the merits." On 30 November 1973 Transamerica noted an appeal to the Court of Appeals. That Court transferred the case to this Court by its order of 31 January 1974. Courts Art. § 12-308 (a) (14); Rule 814. Transamerica contends that the court below erred in refusing to grant declaratory relief and in not granting a judgment in its favor as a matter of law.

## The Uniform Declaratory Judgments Act

The legislative mandate is that the Uniform Declaratory Judgments Act ". . . shall be liberally construed and administered." It is remedial, its purpose being ". . . to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Courts Art. § 3-402. Any court of record, except the District Court of Maryland, may, within its jurisdiction, ". . . declare rights, status, and other legal relations whether or not further relief is or could be claimed. An action or proceeding is not open to objection on the ground that a declaratory judgment or decree is prayed for." § 3-403 (a). The exercise of these general powers is even broader than the expansive powers to construe enumerated by the legislature,[3] for § 3-

---

3. Section 3-406 reads:

"Any person interested under a deed, will, trust, written contract, or other writing constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, administrative rule or regulation, contract, or franchise, may have determined any question of construction or validity, arising under the instrument, statute, ordinance,

403 (b) expressly so provides. Moreover, the legislature has spelled out, § 3-409 (a), that, except in cases in which divorce or annulment of marriage is sought, a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if (1) an actual controversy exists between contending parties; (2) antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or (3) a party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it. Concurrent remedies are no bar for declaratory relief. § 3-409 (c).[4] It is firmly established that seldom, if ever, should a bill or petition in a declaratory judgment proceeding be dismissed without a declaration of the rights of the parties. *Kacur v. Employers Mutual Casualty Co.*, 253 Md. 500; *Savings Bank of Baltimore v. Bank Commissioner of the State of Maryland*, 248 Md. 461. See *Borders v. Board of Education of Prince George's County*, 259 Md. 256; *Baltimore Import Car Service & Storage, Inc. v. Maryland Port Authority*, 258 Md. 335. Discretion in the courts to refuse a declaratory judgment is very limited. For example, judgment may be refused where it does not serve a useful purpose or terminate a controversy. *Liss v. Goodman*, 224 Md. 173; *Bachman v. Lembach*, 192 Md. 35. Thus, jurisdiction in declaratory judgment cases is not necessarily mandatory, *Schanker v. State*, 208 Md. 15, and a court is not empowered to decide

---

administrative rule or regulation, contract, or franchise and obtain a declaration of rights, status, or other legal relations under it."

Section 3-407 states that "A contract may be construed before or after a breach of the contract."

Section 3-408 enables the determination of any question arising from the administration of an estate or trust, including questions of construction of wills and other writings.

Section 3-403(b) provides that such enumeration does not limit or restrict the exercise of the general powers in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty.

4. Under § 3-409 (b), however, if a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed.

moot questions or abstract propositions. *Liberto v. State's Attorney of Baltimore City,* 223 Md. 356; *Davis v. State,* 183 Md. 385. And the declaratory procedure should not be used to decide purely theoretical questions or questions which may never arise. *County Commissioners of Queen Anne's County v. Miles,* 246 Md. 355. On the other hand, because the object of the Act is to supplement and enlarge procedural relief in a field not wholly or adequately occupied by subsisting remedies of law and equity, a declaration, available at law as well as in equity, *Himes v. Day,* 254 Md. 197, should be given, affirmative or negative in form and effect, § 3-411, when there is a justiciable issue, *Woodland Beach Property Owners' Assn. v. Worley,* 253 Md. 442.[5]

*The Instant Case*

We believe it clear, as the court below found,[6] that a justiciable issue was presented. The general rule is that the remedy of declaratory judgment is appropriate for the purpose of construing an insurance policy and determining the rights and obligations of insurer and insured under its provisions. *World Insurance Co. v. Perry,* 210 Md. 449, 452, and cases cited therein.

The declaratory judgment the court here granted, despite its statement that the Petition therefor was denied, was to order Transamerica to defend the action against Mrs. Brohawn "under the non-waiver agreement executed between the parties." It is not necessary that a declaratory judgment be in any particular form, as long as the court, by its order or decree, actually passes upon or adjudges the issues raised by the proceedings. *Bruce v. Director,* 261 Md. 585; *Reddick v. State,* 213 Md. 18. It expressly left the matter

---

5. An issue is justiciable when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded. *Patuxent Oil Co. v. County Commissioners of Anne Arundel County,* 212 Md. 543.

6. The court said in its opinion:

"Transamerica Insurance Company has raised a justiciable issue under the pertinent sections of Article 31A [now Courts Art. §§ 3-401, etc.] and under the direction of the Court of Appeals in *Glens Falls Ins. Co. v. Amer. Oil Co.,* 254 Md. 120 to require the Court to determine the issues raised."

of coverage under the policy for collateral determination at trial on the merits.

*The Obligation of Transamerica to Defend the Civil Action*

Transamerica complains about the court's action:

> "That order places Appellant in precisely the kind of insoluble dilemma which prompted it to file this Declaratory Judgment action. Appellant *cannot* present to the jury in the tort action the issue of whether the acts of Mary Brohawn were with intent to injure, or argue that such acts were committed with such intent. If it defends Mary Brohawn in obedience to the trial court's order, it must do so exclusively, in *her* interest, and it cannot, therefore, argue in its own interest that the acts were committed with intent to injure, which would be prejudicial to the insured, especially in view of the fact that Count I of the Declaration in the tort case demands $100,000.00 in punitive damages."

It asserts that *Glens Falls Insurance Company v. American Oil Company,* 254 Md. 120 provides relief from that "impossible situation."

Although the precise question in *Glens Falls* [7] was not the same as the question presented to us, we think that the legal principles enunciated in that opinion are applicable to the issue here. Under the insurance contract in *Glens Falls* the insurance company, as here, agreed to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages as covered by the terms of the

---

7. The Court in Glens Falls stated the question at 121-122:

"This appeal presents for the first time in this Court the question of whether or not an insurer in the usual type of automobile liability policy may, in an action by a third party seeking indemnity under the policy, raise a defense of non-coverage based on an intentional, non-accidental act by the insured, subsequent to a judgment in favor of the third person against the insured in an action in which the declaration declared in negligence and in which the insurer was not a party and did not defend."

policy. In *Glens Falls*, as here, the company agreed, with respect to such insurance as is afforded by the policy for bodily injury liability and for property damage liability, to "... defend any suit against the insured alleging such injury ... and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any action or suit as it deems expedient...." [8] In *Glens Falls*, as here, the insurer, after investigation, took the position that there was no coverage under the policy. In *Glens Falls*, the representative of the deceased insured refused to sign a non-waiver agreement, and we find no such executed agreement here.[9]

In *Glens Falls*, at 135, the Court observed that "[w]hile, at first glance, it would appear that the insurer's agreement ... to 'defend any suit against the insured * * * [within the coverage of the policy], even if such suit is groundless, false or fraudulent.' absolutely obligated it to defend the action ... the policy cannot be so construed." It explained, at 135-136:

> "To require the insurer to defend, under the circumstances of the present case, would put both the insurer and the insured in the untenable position of attempting to cooperate in the conduct of the litigation when their interests were, in fact, adverse ... If the insurer were to proceed to undertake the defense of its insured under these circumstances, it could not be allowed to prove facts contrary to the interests of the insured, yet by participating in the action, it would be estopped from re-litigating the same questions in a subsequent action. Thus, it must be concluded that the insurer's obligation to defend is relieved where,

---

8. These are the relevant provisions of the policy issued by Glens Falls as quoted in 254 Md. at 126-127. For comparable provisions of the policy here at issue see *supra*.

9. On its face, the letter of 14 March 1972 from Transamerica to the Brohawns reserved rights under the policy only with regard to action taken "to determine the cause and other facts pertaining to the above captioned incident which occurred on or about November 24, 1970...."

as here, it is faced with an unresolved conflict of interest to that of its insured." (Citation omitted)

The Court agreed with the majority opinion in *Farm Bureau Mutual Automobile Ins. Co. v. Hammer*, 177 F. 2d 793 (4th Cir. 1949), *cert. denied*, 339 U. S. 914, from which it quoted, 254 Md. at 132-133:

" 'It is obvious that the Insurance Company was not qualified to undertake the defense of the insured in the suits by the injured parties against him, and that this disqualification was due to the insured's own conduct. It was not possible for the company in th se suits to defend the insured, and at the same time to protect its own interests. It could not exculpate itself by showing that the injurious acts of the insured were beyond the scope of the policy, for this showing would establish the liability of the insured to the injured parties to an even greater extent than that claimed in the complaints. . . .

" 'The situation is not changed by the express agreement of the company in the policy in suit to defend any suit against the insured based upon alleged actions within the coverage of the policy. The clear purpose of this provision is to impose upon the company not only the obligation to pay any judgment against the insured, but also to bear the burden of defending any suit against him within the purview of the policy. It could not have been intended, however, to extend the coverage of the policy or to nullify its conditions. That would have been the case if the company were not only bound to defend any action for damages alleged to have been caused by accident due to neglect, but should thereby be estopped to show in any court that the damages were intentionally caused by the criminal conduct of the insured. If that were so, the assault and battery clause would be effectively excised from the indemnity contract and the

insured, as well as the injured party, as subrogee of the rights of the insured, would be able to avoid one of the conditions upon which the policy was issued. The Insurance Company was justified in withdrawing from the defense of the suit in the Virginia court when the character of the insured's conduct was disclosed, and by so doing, it preserved its right to make its present defense.' (177 F. 2d at 801)."

The Court in *Glens Falls* concluded, therefore:

"Thus, as Glens Falls could not reasonably be required to defend the action under the circumstances with which it was faced here, it could pursue one of three alternatives: (1) refuse to defend and disclaim liability (as it, in fact, did), (2) defend the action against the insured under a non-waiver agreement, or (3) obtain a preliminary resolution of the conflict by instituting an action for a declaratory judgment in regard to coverage under the Uniform Declaratory Judgment Act, Maryland Code, Article 31A." 254 Md. at 136.

Pointing out that by following the first alternative the company acted at its peril, "and if such defense is found to be lacking, then for purposes of liability, it is bound by the judgment . . . against its insured," at 137, it observed that " [t]he third alternative, seeking declaratory relief in regard to coverage [which is entirely permissive and not mandatory], would seem to provide the best solution." At 136.

It seems reasonable that Transamerica not follow the first alternative, for, in so doing, it would act at its peril. As to the second alternative, although the order of the court below was couched in terms of "the non-waiver agreement executed between the parties", we find no "non-waiver agreement" executed by the parties reflected in the record. Apparently the court was referring to the letter of 14 March 1972 from Transamerica to Mr. and Mrs. Brohawn. See *supra.* But this letter, signed only by Transamerica, went

merely to a reservation of rights to investigate the question of coverage, not to defend the action. There remains the third alternative, which seemed to the Court in *Glens Falls* to provide the "best solution" in any event. Transamerica, in fact, resorted to it, attempting to obtain a resolution of the conflict with which it was faced by petitioning for a declaratory judgment. The court below, however, did not resolve the essential issues presented to it. As we have indicated, it denied the Petition, and although it ordered Transamerica to defend the action against Mrs. Brohawn, it expressly left the matter of coverage under the policy for determination at trial of the tort action. We think that the court erred. Transamerica was entitled in the action filed by it to a declaration of its rights and obligations with respect to the matters prayed in its Petition, basically whether it was liable under the policy. We reverse the order of the court below and remand the case for further proceedings.

## The Procedure on Remand

We are aware that a declaratory judgment proceeding to ascertain the rights and obligations under the insurance policy would entail a determination of the issues presented in the tort actions, except for the assessment of damages in the event Mrs. Brohawn is found to be liable for the acts attributed to her.[10] We see no compelling reasons why the declaratory proceeding may not resolve the question of Brohawn's liability — whether she committed the acts alleged, and if she did, whether she committed them intentionally or committed them negligently, whereby Shaffer and Friend were injured. This, to be sure, will require factual findings upon conflicting evidence, but, findings of fact are within the purview of the Declaratory Judgments Act. Moreover, if the case is heard before a jury, the jury may make factual determinations in a declaratory proceeding upon issues submitted to them. Courts Art. § 3-404 provides: "The fact that a proceeding is brought under this subtitle does not affect a right to jury trial which

---

10. The Petition for declaratory relief did not seek an assessment of damages. Damages would ordinarily be assessed in the tort action.

otherwise may exist." The Revisor's Note to the section states that it was based on Art. 31A, § 9, which read: "When a proceeding under this article involves the determination of issues of fact, such issues may be submitted to a jury in the form of interrogatories, with proper instructions by the court, and either a general or special verdict may be taken." The note continued:

> "The section is revised to reflect the fact that a jury trial is not available in a court of equity. When the Uniform Declaratory Judgments Act was adopted in 1945 there was a practice of transferring issues of fact arising in an action in equity to a court of law for an advisory verdict and this apparently applied to a proceeding under this subtitle. This practice was abolished by Rule 517. In addition, the rule provides that the determination of all issues in a court of equity shall be made without a jury. In view of that development of the law, it is desirable to clarify the jury trial provision of Article 31A, § 9." [11]

Thus, the factual determinations necessary to a fixing of liability may be made in the declaratory action instituted by Transamerica. The finder of fact will ascertain whether Mrs. Brohawn committed the alleged act. If it finds that she did, it will determine whether the acts were negligently committed or intentionally committed. Thereupon, the

---

11. In *Mayor and City Council of Baltimore et al. v. Silver, et ux.*, 263 Md. 439, 462, the Court of Appeals said:

"We cannot conceive of further proceedings being pursued which would not result in an evidentiary hearing in which there would be facts in dispute. Such proceedings would, in our opinion, be an impermissible extension of the purposes of declaratory relief as contemplated under Code, Article 31A."

We construe this statement, not as a holding that no factual determination may be made in a declaratory judgment proceeding, but in the context of a summary judgment, the refusal of which by the lower court was being reviewed by the Court of Appeals. The statement was made in response to the request of the City "that should this Court affirm the lower court's refusal to grant its motion for a summary judgment, that we not affirm the dismissal of its petition for declaratory judgment but remand the case for further proceedings within the framework of declaratory relief." The Court was not disposed to do so.

liability of Mrs. Brohawn, the coverage under the policy, and the liability of Transamerica will be resolved.[12] Judgment in accordance with the findings shall be entered in the declaratory proceedings, and being *res judicata*, could be the basis for a motion in the tort action for judgment on the question of liability under either count one or count two as may be appropriate. If the judgment fixing liability is in favor of Shaffer and Friend and against Brohawn, it could be extended in the tort case by the assessment of damages upon an inquisition hearing.

Courts Art. § 3-405 mandates that although the declaratory judgment shall not prejudice the rights of any person not a party to the proceeding (except in a class action), subsection (a) (2), "a person who has or claims any interest which would be affected by the declaration, shall be made a party", subsection (a) (1). Here, as required, all persons who had, or claimed any interest, were parties to the declaratory judgment proceeding, and there is no question as to their being bound by the declaratory judgment. See *Williams v. Moore*, 215 Md. 181; *Reddick v. State*, 213 Md. 18.

---

12. We note that the fact that Mrs. Brohawn pleaded guilty to assault in the criminal trial would be relevant to her liability. Transamerica suggests that pleading guilty in the criminal proceeding permits only one inference, that she assaulted Mrs. Shaffer and Mrs. Friend with the intent to injure them, thus excluding coverage under the policy. We observe that the evidence of her plea to the criminal charge may be introduced in the civil action as an admission against interest. *Campfield v. Crowther*, 252 Md. 88, 100-101. But she may explain the reasons for her plea. McCormick, *Law of Evidence* (1954), § 242, p. 512. The transcript of the criminal trial shows that Mrs. Brohawn was informed of and advised with respect to her rights and the consequences of the plea as required for a valid acceptance of a plea of guilty. Cognizant of all of those matters, she still desired to enter the plea. She expressly told the court upon its inquiry of her that the plea was made freely, voluntarily and understandingly, without compulsion, duress, promises or threats, that she was satisfied with the services of her counsel and that she felt she had been properly and competently represented. At the declaratory judgment proceeding she explained the reason for the plea through Mrs. Schmidt's attorney. He testified that Mrs. Brohawn and Mrs. Schmidt pleaded guilty to assault by way of plea bargaining, through negotiations conducted with the State's Attorney. The bargain was that the State "would accept a plea of guilty to a lesser charge of assault in return for dismissing the kidnapping charge." The plea was characterized by the attorney as voluntary, but "made after plea bargaining even though she professes her innocence."

We expressly reach no conclusion here as to the effect of the plea.

What we suggest is not without precedent in this jurisdiction. It is precisely what was done in *State Farm Mutual Auto Insurance Company v. Treas, et al,* 254 Md. 615, where, apparently, the propriety of such a proceeding was not even questioned.[13]

We are cognizant of arguments advanced against the procedure herein indicated, and of other procedures suggested by some authorities. See Note, *The Role of Declaratory Relief and Collateral Estoppel in Determining the Insurer's Duty to Defend and Indemnify,* 21 Hastings Law Journal, 191 (1969); Note, *Use of the Declaratory Judgment to Determine a Liability Insurer's Duty to Defend — Conflict of Interests,* 41 Indiana Law Journal, 87 (1965); Comment, *The Insurer's Duty to Defend under a Liability Insurance Policy,* 111 University of Pennsylvania Law Review, 734 (1966); Comment, *Insurance — Duty to Defend — Conflict of Interests,* 3 Natural Resources Journal 185 (1963), and the cases cited and discussed in the articles. We are convinced, however, that the procedure adopted here, while not without some disadvantages, best lends itself to the interests of justice when compared with the alternatives.[14]

*Obligation to Pay Attorneys' Fees*

Our disposition of this case has not completely resolved

---

**13.** The facts in *State Farm* are significantly comparable. There was a suit by *State Farm* as the insurer against George Martin Treas, Jr., Harry A. Dawson, individually and as surviving husband of Irma R. Dawson, and the Unsatisfied Claim and Judgment Fund for a declaratory judgment that a policy issued by State Farm to Treas did not provide coverage for the death of Mrs. Dawson. Under the terms of the policy, State Farm agreed to pay for bodily injury liability incurred by Treas in the operation of an automobile if the injury was caused "by accident." The insurer urged at the trial that the injuries which resulted in the death of Mrs. Dawson were caused by intentional acts of Treas. The lower court found that the death was an accidental injury within the coverage of the policy. The Court of Appeals reversed, convinced that the lower court erred, holding that the death was not "caused by accident" within the meaning of the policy but by the intentional act of Treas. It found that the intentional act was not an accident because in that act there was nothing unforeseen, unusual and unexpected occurring which produced the result.

**14.** The trier of fact in the declaratory proceeding would be aware, of course, that there was an outstanding contract of insurance. We point out that here the declaratory action was initiated by the insurer.

the matter of the contractual obligation as provided in the insurance policy on the part of the insurer to defend its insured, and the corresponding right of the insured to be defended by the insurer in ". . . any suit against the Insured alleging such bodily injury or property damage and seeking damages which are payable under the terms of [the pertinent section of the policy], even if any of the allegations of the suit are groundless, false or fraudulent . . . ." Any act committed by or at the direction of the insured with intent to cause injury or damage to person or property was excluded from the coverage of the policy. It is clear that the addition of the count alleging that Mrs. Brohawn negligently committed the acts, brought the suit within the ambit of the defense clause of the policy, as limited, however, by the holding in *Glens Falls*. The import of our holding thus far on the matter of duty to defend is merely that the clause pertaining to defense of the suit does not preclude Transamerica from maintaining its declaratory action. In that action Mrs. Brohawn is properly to be represented by counsel of her choosing. But the obligation of Transamerica is not entirely relieved. If in the declaratory proceeding it is determined either that Mrs. Brohawn did not commit the alleged acts, or that she did negligently commit them, causing the injuries, then Transamerica is properly liable to pay reasonable counsel fees and expenses incurred by her in the declaratory action.[15] We find that *Cohen v. Am. Home Assurance Co.*, 255 Md. 334, in which the Court of Appeals expressly overruled any holding in *Erie Insurance v. Lane*, 246 Md. 55, subject to a contrary interpretation, is dispositive of the matter. In that case the insured was sued in tort for damages resulting from an automobile accident. The insurer declined to defend. The insured brought suit for a declaratory judgment to determine to what extent, if at all, coverage existed on the policy issued. The lower court found that the insurer was bound to defend and awarded the

---

**15.** Upon a determination that the insured negligently committed the acts causing the injuries, the insurer would, of course, not only be obliged under the policy, but, we believe, anxious, to defend the insured at any inquisition to assess damages.

insured an amount stipulated to be reasonable as counsel fees and expenses in the declaratory action. The Court of Appeals affirmed both the finding of the duty to defend and the award. It said that whether one speaks in terms of the insurer having authorized the expenditure by its failure to defend or whether one speaks in terms of the attorney's fees for the declaratory judgment action being a part of the damages sustained by the insured because of the insurer's wrongful breach of the contract, the insurer was bound to pay the fees incurred by the insured in bringing the declaratory judment action to establish that the insurer had not done that which it had agreed to do. If an insurer is so bound as to such a declaratory judgment action brought by an insured, certainly it is so bound as to a declaratory judgment action brought by the insurer which the insured must defend.

There is, however, another possible resolution of the matters which are the subject of the declaratory action. It may be determined that Mrs. Brohawn intentionally committed the acts alleged. In that event, we see no duty on the part of Transamerica to pay counsel fees and expenses incurred by Mrs. Brohawn in the declaratory action. If she committed the acts with intent to injure, there is no coverage under the policy. The policy does not call for the insurer to defend the insured in a suit based on such purposeful conduct, but in a suit grounded on allegations of negligent acts by the insured even if such allegations are groundless, false, or fraudulent. We observe that had Transamerica declined to defend the tort action, and that action resulted in a determination that the injuries were caused by the intentional acts of Mrs. Brohawn, Transamerica could not be held to have had a duty to defend her. We think the same holds good for the declaratory action.

*Order of 7 November 1973 reversed; case remanded for a new trial; costs to be paid by appellant.*

*Lowe, J., dissenting:*

One of the incentives held out by corporate liability insurers in addition to "pay[ing] on behalf of insured all sums . . . obligated . . . as damages . . ." is the vast investigative and legal pool of resources placed at an insured's disposal, with which it promises to defend any suit " . . . even if any of the allegations of the suit are groundless, false or fraudulent . . . ." By their ruling today, the majority permits those vast legal resources contracted for by the insured as his protection to be utilized to his disadvantage. The majority succinctly sets the stage.

> "Thus, the factual determinations necessary to a fixing of [Mrs. Brohawn's] liability may be made in the declaratory action instituted by [her insurer] Transamerica.
>
> The finder of fact will ascertain whether Mrs. Brohawn committed the alleged act. If it finds that she did, it will determine whether the acts were negligently committed or intentionally committed.
>
> Thereupon, the liability of Mrs. Brohawn, the coverage under the policy, and the liability [if any] of Transamerica will be resolved." pp. 18-19.

This setting permits Mrs. Brohawn's defender to bring and control a suit by which it becomes her opponent. Mrs. Brohawn's problems began with the prospect of a law suit arising from the altercation between her and her initial accusers. The problems escalated when Transamerica sought a declaratory judgment which in effect caused it to join the accusers rather than to defend as contracted. The majority encourages the insurer to lay down the shield for the Brohawns at the first sign of attack and pick up a sword to join the assaulting force. The insurer's resources are then permitted by the majority to be utilized to attempt to prove not only that Mrs. Brohawn has done what she denies but has done it intentionally, thereby subjecting her to even greater damages of a punitive nature. With one observation of the majority as to their remand procedure I most readily

concur, it is "not without some disadvantages . . . ." My concern is that the insured becomes a disproportionate recipient of those disadvantages. It is little solace to the Brohawns that if their insurance carrier doesn't defeat them by proving the tort intentional, it will then have to conform to its contract.[1]

If some disadvantage must result from any of the three alternatives, described by the majority from *Glens Falls*, 254 Md. at 136, it is troubling to find that we resolve them in favor of the corporate carrier which drafted the contract and which has not yet been compelled to perform, as opposed to the individual "insured" who has relied on the seemingly unrestricted promise to defend and who has fully performed with payments for protection, in advance, year after year after year. Either of the other two alternatives described seems far more conscionable.

Certainly alternative number two could result in no harm to either party, *i.e.*, if the company were to defend the action under a non-waiver or reservation of rights agreement. The concern expressed that the corporate counsel would be placed in an awkward conflict of interests between his allegiance to the insurer and his duty to the insured, is ironic in the light of the position in which he is placed by the declaratory judgment procedure. At least in the second alternative his *duty* would be clear — that is to defend the insured — and I refuse to believe an officer of this court would do otherwise. Indeed, I fail to see the concern expressed as to the first *Glens Falls* alternative, of compelling the insurance company to defend or decline at its peril. That is precisely the decision that must be made by every party to every contract when one party suddenly sees he may not have the best of all possible worlds.

While I agree that there may be circumstances conceivable where the declaratory remedy may be appropriate, I part with the majority when it so crystallized these particular factual circumstances as to deny the trial

---

1. Even counsel fees are provided for by the majority — *if* the company does not prevail.

judge any discretion. We are far less able to balance the equities of the various procedures as applied to each case than is he. And we should not lose sight of the basic purpose of the declaratory relief. It is a convenience, to avoid *unnecessary* litigation but never intended to reverse established rights, substantive or procedural.

It is significant that the majority is persuaded by a preference (not a directive) expressed by Judge Barnes in *Glens Falls*, 254 Md. at 136,[2] that the "third alternative, seeking declaratory relief in regard to coverage ... *would seem to provide the best solution.*" (Emphasis added). This suggestion, even from so eminent a jurist as Judge Barnes, may be persuasive but is not obligatory. The question posed by *Glens Falls* was not whether the declaratory judgment procedure was available. Its availability as an alternative was never questioned. The issue was whether or not *Glens Falls* was estopped from denying coverage having declined to attempt the declaratory judgment route, and the answer was clearly in the negative.

The question decided today is quite different. Here we are telling a trial judge who had the parties and issues before him that he is without discretion to decide that the alternative pursued is not appropriate under the *facts and circumstances of the particular case,* notwithstanding the petitioner sought a declaration of rights under a contract whose very language has been interpreted by *Glens Falls, supra.* The majority has lost sight of the fact that *Glens Falls* decided that the contract did not compel the insurer to

---

**2.** In addition to the Glens Falls dictum the majority points to State Farm Mutual Auto Insurance Co. v. Treas, et al., 254 Md. 615, "where, apparently, the propriety of such a proceeding was not even questioned." The reason is apparent. The Court of Appeals limits the scope of their review to questions " ... tried and decided by the lower court." Md. Rule 885. That the "propriety of [the] ... proceeding was not ... questioned" when the issue had never been raised does not place the Court of Appeals' stamp of approval on all like procedures which may later be called in question.

I do not question that the procedure is permissible when used as an alternative, nor should it be prohibited if unquestioned by the parties. However, when called in question, under each factual context the trial judge should be left free to balance the equities. The issue should not be foreclosed without regard to the individual variables of each case.

defend the questionable claim nor did it preclude it from relitigating the question of coverage after declining to defend. In short it left all options open to the insurance company whose rights were uninjured.

Although I agree that under the *Glens Falls* decision, the lower court here could have permitted the action, I nevertheless believe the determination of the propriety of the remedy was within the lower court's discretion. Under the majority decision the short cut declaratory procedure is compelled by the mere application therefor, withdrawing any discretion from the trial judge and leaving the unassailable choice of procedure solely to the insurer. Basic rights of the primary parties in interest including the principal issue of liability, are decided by this third party determination of alternatives. A review of that final determination by a dispassionate trial judge is, to me, much to be preferred over an absolute right of election by either party. The very fact that this court remains divided is some indication that reasonable minds might differ in different circumstances. Most assuredly "circumstances alter cases." [3] The decision of which procedure provides the best balance under each set of circumstances is best left to an impartial arbiter rather than a party of interest.

Finally, the power to construe under the Uniform Declaratory Relief Act is precisely that — a power to construe. A party may have "determined any question of *construction or validity* . . ." of the contract and "obtain a declaration of rights, status, or other legal relations under it." Cts. and Jud. Proc. Art., § 3-406. Nowhere do I find the slightest intent indicated by the Legislature to permit the tort liability to be determined as an incident of the "question of construction." The procedure permitting obtention of a declaratory judgment was provided to alleviate rather than compound procedural problems. It was surely not meant to interfere with the parties' well-established rights.

I respectfully dissent and Judge Davidson has authorized me to say that she joins me in so doing.

---

3. "The Old Judge" by Thomas Chandler Haliburton ("Sam Slick").